# Eligibility of Involuntary Wartime Relocatees to Japan for Redress Under the Civil Liberties Act of 1988

The proposed Department of Justice change in its interpretation of the Civil Liberties Act of 1988 to extend redress under the Act to minors who accompanied their parents to Japan during World War II and to adults who are able to show that their relocation to Japan during that period was involuntary is a reasonable and permissible interpretation of the statute

Although an agency interpretation that has been modified or reversed is likely to receive less deference by a reviewing court than a consistent and contemporaneous interpretation, the fact of modification does not preclude the court from granting deference to the new interpretation

May 10, 1994

MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL
CIVIL RIGHTS DIVISION

This memorandum is in response to your request for this Office's review of the proposed change in eligibility determinations under the Civil Liberties Act of 1988, Pub. L. No. 100-383, 102 Stat. 903 (codified at 50 U.S.C. app. § 1989 (1988)) ("the Act"). The proposed change would extend redress under the Act to minors who accompanied their parents to Japan during World War II and to adults who are able to show that their relocation to Japan during that period was involuntary. We conclude that the proposed change is a reasonable and permissible interpretation of the statute.

We also have analyzed the implications of this change as to the deference the Department can expect from a reviewing court in the event of a challenge. An agency interpretation that has been modified or reversed is likely to receive less deference than a consistent and contemporaneous interpretation, but the fact of modification does not preclude a court from granting deference to the new interpretation.

1. The Civil Liberties Act of 1988 enacts into law the recommendations of the Commission on Wartime Relocation and Internment of Civilians established by Congress in 1980. H.R. Conf. Rep. No. 100-785, at 1 (1988). The Commission submitted a unanimous report to Congress in 1983, entitled *Personal Justice Denied,* "which extensively reviewed the history and circumstances of the decision to exclude, remove," and ultimately to intern "Japanese Americans and Japanese resident aliens from the West Coast, as well as the treatment of the Aleuts during World War II." Redress Provisions for Persons of Japanese Ancestry, 54 Fed. Reg. 34,157 (1989). The final part of the Commission's report, *Personal Justice Denied 2: Recommendations,* concluded that these events were influenced by ra-

cial prejudice, war hysteria, and a failure of political leadership and recommended that Congress and the President take remedial action. *Id.*

The Civil Liberties Act of 1988 was signed into law by President Reagan on August 10, 1988. The purposes of the Act are to acknowledge and apologize for the fundamental injustice of the evacuation, relocation, and internment of Japanese Americans and permanent resident aliens of Japanese ancestry; to make restitution to the individuals who were interned; and to fund a public education program to prevent the occurrence of any similar event in the future. 50 U.S.C. app. §§ 1989-1989a. Any "eligible individual" living on the date of enactment is entitled to a restitution payment of $20,000. 50 U.S.C. app. § 1989b-4(a)(1).

The Attorney General is responsible for identifying, locating, and authorizing payment to all eligible individuals. 50 U.S.C. app. § 1989b-4. The Attorney General delegated the responsibilities and duties assigned by the Act to the Assistant Attorney General for Civil Rights, who created the Office of Redress Administration in the Civil Rights Division (the "Division") to execute the duties of the Department under the Act. The regulations governing eligibility and restitution were drafted in the Office of Redress Administration and published under the authority of the Department in 1989. 54 Fed. Reg. 34,157 (1989) (final rule) (codified at 28 C.F.R. § 74).

Section 108(2) of the Act defines the individuals eligible for redress payments as any United States citizen or permanent resident alien of Japanese ancestry who was evacuated, relocated, or interned during World War II.[1] This provision specifically excludes from eligibility "any individual who, during the period beginning on December 7, 1941, and ending on September 2, 1945, relocated to another country while the United States was at war with that country." 50 U.S.C. app. § 1989b-7(2) ("the relocation exclusion"). The relocation exclusion in the regulations governing eligibility determinations under the Act uses precisely the same language. 28 C.F.R. § 74.4.

The regulations do not specifically address the eligibility of minors who accompanied their parents to Japan during this period or of adults who claim that their relocation was involuntary. However, the notice accompanying the publication of the final regulations noted that the Department had received sixty-one comments supporting eligibility for the minors. After considering these comments, the Department determined that "the exclusionary language of the Act would preclude from eligibility the minors, as well as [the] adults, who were relocated to Japan during that particular time period." 54 Fed. Reg. at 34,160.

In a 1989 memorandum outlining the eligibility determinations, the Civil Rights Division considered the claims of the minor evacuees. The Division noted that

---

[1] As enacted in 1988, the Act limited eligibility to those of Japanese descent. The 1992 amendments added language extending eligibility to any spouse or parent of an individual of Japanese descent who accompanied her spouse or child through the evacuation, internment, or relocation. Civil Liberties Act Amendments of 1992, Pub. L. No. 102-371, 106 Stat. 1167. The question of the eligibility of the minor and involuntary adult relocatees was not considered or discussed in the debates on the 1992 amendments.

minor children were not in a position to make their own choice regarding emigration. However, in light of the language excluding *any* individual who relocated to Japan during the period and the lack of any expression of legislative intent to distinguish the minor relocatees from adults, the Division took the position that these minors were ineligible. Memorandum for Douglas W. Kmiec, Assistant Attorney General, Office of Legal Counsel, from James P. Turner, Acting Assistant Attorney General, Civil Rights Division at 11-12 (Feb. 27, 1989). OLC concurred in this determination without exposition. Memorandum for James P. Turner, Acting Assistant Attorney General, Civil Rights Division, from Douglas W. Kmiec, Assistant Attorney General, Office of Legal Counsel (Apr. 17, 1989).

In litigation challenging the Division's current eligibility standards, counsel for the plaintiffs have advanced an analysis that was not considered by the Department in 1989. In that analysis, claimants' counsel contend that the use of the active voice in the language of the relocation exclusion provision renders the statute ambiguous as to the eligibility of relocatees who were involuntarily returned to Japan. Given this ambiguity, counsel argue, an interpretation which allows involuntary relocatees to recover under the Act is reasonable. The Division is persuaded by this analysis and takes the position that while its original interpretation of the statute deeming involuntary relocatees ineligible was reasonable, the proposed new interpretation is equally reasonable. The proposed change in eligibility determinations is thus a change in the Department's interpretation of its own regulation. Since the language of the regulation is identical to the language of the statute, the Department would effectively be changing its interpretation of the statute as well.

2. In reviewing the Division's proposed modification to the interpretation of the regulation, this Office's task is to determine whether the construction adopted by the Civil Rights Division is a permissible one. As the Supreme Court stated in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984):

> If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, . . . the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842-43 (footnotes omitted). The Department cannot revise its interpretation of the Act's eligibility exclusion if the original interpretation is mandated by the plain language of the statute. If, however, the statutory language is ambiguous and the proposed modification is reasonable, the Division's proposed interpretation is permissible.

3. As enacted, section 108(2)(B)(ii) of the Act expressly excludes from eligibility "any individual who, during the period beginning on December 7, 1941, and ending on September 2, 1945, *relocated* to [another] country while the United States was at war with that country" (emphasis added). This language does not specifically address the eligibility of minor relocatees who accompanied their parents, or the voluntariness of these repatriations.

While the statute uses the active voice in this exclusion clause, the eligibility clauses of the statute use the passive voice. For example, section 108 begins by defining an "eligible individual" as a person of Japanese ancestry "who, during the evacuation, relocation and internment period — . . . *was* confined, held in custody, relocated, or otherwise deprived of liberty or property as a result of . . . [various Executive Orders and Acts]." 50 U.S.C. app. § 1989b-7(2) (emphasis added). Title II of the Act, which provides reparations to Aleuts evacuated from their home islands during World War II, similarly defines an eligible Aleut as a person "who, as a civilian, *was* relocated by authority of the United States from his or her home village . . . to an internment camp." 50 U.S.C. app. § 1989c-1(5) (emphasis added). The use of the active voice in the exclusion clause suggests the possibility that Congress intended to exclude only those individuals who voluntarily relocated to an enemy country during the war.

We agree that this language creates an ambiguity which provides a reasonable basis for distinguishing between voluntary relocatees, who are ineligible under the statute, and involuntary relocatees. The U.S. Courts of Appeals for the District of Columbia and the Ninth Circuits have deemed the use of the active as opposed to the passive voice relevant for purposes of statutory interpretation. *Dickson v. Office of Personnel Management*, 828 F.2d 32, 37 (D.C. Cir. 1987) (isolated use of passive voice in phrase defining liability is significant and allows suit against OPM whenever an adverse determination "is made," even if by another agency); *United States v. Arrellano*, 812 F.2d 1209, 1212 (9th Cir.) (clause of statute defining criminal intent phrased in active voice applies to conduct of the accused, while second clause phrased in passive voice applies only to the conduct of others), *as amended*, 835 F.2d 235 (9th Cir. 1987).

The legislative history of the Act does not provide any insight into congressional intent regarding the eligibility of involuntary relocatees. As originally introduced, neither the House or the Senate bill included a relocation exclusion provision in the section defining eligible individuals. Entering conference, the House version of the Act contained the exclusion, while the Senate version had no such provision. The conferees agreed to adopt the House provision, which excluded "those individuals who, during the period from December 7, 1941, through September 2, 1945, relocated to a country at war with the United States." H.R. Conf. Rep. No. 100-785, at 22. There is no additional discussion of the relocation

exclusion or of the circumstances surrounding the relocation of internees to Japan in the conference report.[2]

While the Civil Rights Division's proposed interpretation is not the only possible interpretation of the statute, it is neither precluded by the plain language of the statute nor unreasonable. Since minor relocatees below a certain age lacked the legal capacity to consent to relocation, their relocation was involuntary per se.[3] The statute does not bar the Civil Rights Division from declaring these minors eligible for relief. Similarly, it is reasonable to conclude that the statute does not bar from relief claimants who can provide evidence that their relocation was in fact involuntary.

Arguably, the Civil Rights Division's proposed narrowing of the breadth of the relocation exclusion is *more* reasonable than its earlier interpretation. Generally, remedial statutes should be interpreted broadly to effectuate their remedial purpose. Any exceptions should be interpreted narrowly. Norman J. Singer, Sutherland Statutory Construction § 60.01 (5th ed. 1992). While courts have generally held that waivers of sovereign immunity granting rights of action against the United States must be strictly construed, they "have on occasion narrowly construed exceptions to waivers of sovereign immunity where that was consistent with Congress' clear intent." *See United States v. Nordic Village, Inc.*, 503 U.S. 30, 34 (1992) (citing, *e.g., Franchise Tax Bd. of Calif. v. United States Postal Serv.*, 467 U.S. 512, 517-19 (1984) (statute authorizing Postal Service to "sue and be sued" waives immunity from orders to garnish wages issued by state administrative boards); *Block v. Neal*, 460 U.S. 289, 298 (1983) (plaintiff's claim under Federal

---

[2] The sole discussion of whether individuals who were returned to Japan should be included in the definition of "eligible individuals" is contained in two witness statements submitted to the House and Senate subcommittees considering the legislation  In testimony opposing the enactment of the bill, the Assistant Attorney General for the Civil Division, Richard K  Willard, noted that as then written (without the relocation exclusion), the breadth of the definition would cover any individual who had been subject to exclusion, relocation, or internment including persons living outside the United States  In the Department s view, this overlooked the fact that at least several hundred of the detainees were "fanatical pro-Japanese, . . and [had] voluntarily sought repatriation to Japan after the end of the war."  The Department believed that allowing these disloyal individuals to receive the benefit of the legislation would be unfair to the United States and to loyal persons of Japanese descent  *To Accept the Findings and to Implement the Recommendations of the Commission on Wartime Relocation and Internment of Civilians.  Hearing on S  1009 Before the Subcomm. on Federal Services, Post Office, and Civil Service of the Senate Comm. on Governmental Affairs*, 100th Cong , 1st Sess  281, 296 (1987) ("Hearings").

Responding to the Department's objections, another witness argued that many of these repatriates acted as they did for reasons unrelated to disloyalty to the United States, namely, their sheer frustration at being incarcerated in prison camps like common criminals and summarily deprived of their personal and constitutional rights  Hearings at 145, 196-97 (statement of Mike Masaoka, representing the Go For Broke Nisei Veterans Assn )  Neither of these statements reveals, or even suggests, an intention to exclude persons who *involuntarily* relocated to an enemy country.

[3] Young children are not capable of exercising the judgment required to manifest legal consent  Furthermore, a minor generally has no right to leave the custody and control of his parents until he reaches majority or is granted emancipation  *Cf. Pierce v  Society of Sisters*, 268 U S  510, 518 (1925) (parents' constitutionally protected liberty includes the right to direct the upbringing of their children), *Gimlett v  Gimlett*, 629 P 2d 450, 452 (Wash  1981) (upon emancipation or majority a person is released from parental authority and becomes sui juris); *In re Luscier's Welfare*, 524 P 2d 906, 908 (Wash. 1974) (the interest of a parent in the custody and control of his minor child is recognized as a sacred right).

Tort Claims Act for negligent inspection not barred by exception disallowing claims for negligent misrepresentation); *United States v. Yellow Cab Co.*, 340 U.S. 543, 554-55 (1951) (FTCA waives immunity where U.S. impleaded as third-party defendant)). The compensatory character of the Act's grant of reparations to specific individuals of Japanese descent interned by the government is of a different nature than a general waiver of immunity in actions that will be brought by unknown plaintiffs. It is appropriate to narrowly construe an exception to this Act.

4. There are potentially two groups of plaintiffs who would have standing to challenge the proposed modified interpretation in court. Because section 104 of the Act provides for payments to be made in order of date of birth, with no more than $500 million to be paid in any year, the newly eligible claimants could "bump" other eligible claimants, delaying or jeopardizing their payments. The age and relatively low number of minor relocatees (as estimated by the Department) make it unlikely that the minor relocatees would significantly affect the payment schedule, but the number and age of involuntary adult relocatees is harder to ascertain.[4] The second group of potential plaintiffs consists of relocatees who are unable to prove that their relocations were involuntary. This second type of challenge is more likely to focus upon the burden of proof and the definition of "voluntary" than upon the reasonableness of the Department's interpretation of the regulation.[5]

It is true that a contemporaneous, consistent interpretation of a regulation or statute by the agency charged with its enforcement will be accorded the greatest deference by the courts, while "[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably

---

[4] Under the Act, the order of payment is determined by date of birth, with the oldest eligible individuals receiving payment first 50 U S C app § 1989b-4(b) Payment from the trust established by the Act is authorized until August 1998 or until the funds appropriated are depleted. 50 U.S C. app § 1989b-3(d) The 1992 amendments placed an additional $400 million in the trust because the Department had already located more eligible individuals than originally estimated

Estimates of the number of minors who were relocated to Japan vary widely Plaintiffs counsel in a suit seeking restitution payments for fourteen minor relocatees cite a Department estimate "that as many as 135 minor children were relocated to Japan" with their parents during the war Memorandum for James P Turner, Acting Assistant Attorney General, Civil Rights Division from Gen Fujioka, Asian Law Caucus, Jim McCabe & Owen Clements, Morrison & Foerster at 3-4 (Sept 22, 1993). In contrast, a witness before the Senate relying on figures published in a monograph by the former director of the War Relocation Authority testified that between 1942 and 1946 a total of 4724 repatriates and expatriates sailed for Japan Of this total, 1659 were alien repatriates, 1949 were American citizens, virtually all children under 20 years of age accompanying their alien parents, and 1116 were former American citizens who had renounced their citizenship. Hearings at 197 (statement of Mike Masaoka, representing the Go For Broke Nisei Veterans Assn ) (citing Dillon S. Meyer, Uprooted Americans The Japanese Americans and the War Relocation Authority During World War II)

Approximately 75 adult relocatees have filed claims with the Office of Redress Administration alleging that their relocations were not voluntary Memorandum for Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, from James P Turner, Acting Assistant Attorney General, Civil Rights Division at 4 (Mar 16, 1994)

[5] The 1992 amendments require that individual claimants receive the benefit of the doubt where "there is an approximate balance of positive and negative evidence regarding the merits of an issue material to [a] determination of eligibility ' 50 U S C app § 1989b-4(a)(3)

less deference' than a consistently held agency view." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987) (citation omitted); *see also General Elec. Co. v. Gilbert*, 429 U.S. 125, 143 (1976). However, in both *Cardoza* and *General Electric*, the Court concluded that the agency's revised interpretation was in conflict with the plain language of the statute in question. The underlying rationale for judicial deference to agency interpretations is as applicable to a modified interpretation of a statute as to the agency's initial construction. *See Chevron*, 467 U.S. at 865 ("it is entirely appropriate" for the agency "to make . . . policy choices"). Accordingly, the Court of Appeals for the D.C. Circuit has held that the principle of deferring to an agency's reasonable construction of an *open-ended* statutory provision "applie[s] equally where . . . we review modification of a previous policy." *Office of Communication of the United Church of Christ v. FCC*, 590 F.2d 1062, 1068-69 (D.C. Cir. 1978). *Cf. Phoenix Hydro Corp. v. FERC*, 775 F.2d 1187, 1191 (D.C. Cir. 1985) (an administrative agency is entitled to change its prior erroneous interpretation of a statute).

## Conclusion

The Civil Rights Division's proposed interpretation of the regulation governing eligibility for redress payments is a reasonable interpretation of the regulation and of the Act. The language of the exclusion provision is ambiguous as to whether Congress intended to prevent involuntary relocatees from receiving restitution. The proposed interpretation does not contradict the language of the statute or the statute's legislative history and is consistent with the strong remedial purpose underlying the Act. Although there is a litigation risk associated with this modification, it is unlikely that a court would overturn the proposed interpretation. While this modification does not require formal rulemaking procedures, it would be advisable for the Department to publish a notice of the change and the underlying reasons in the Federal Register.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*