In re Clarence E. WINCHESTER
and Juanita C. Winchester.

Juanita C. WINCHESTER, Individually,
and as Executrix of the Estate of Clar-
ence E. Winchester, Debtor–In–Posses-
sion, Plaintiff,

v.

COMMODITY CREDIT CORPORATION
and United States of America, Acting by
and Through the United States Depart-
ment of Agriculture, Agricultural Stabi-
lization and Conservation Service, De-
fendants.

Bankruptcy No. 89–31324.
Adv. No. 91–3047.

United States Bankruptcy Court,
N.D. Mississippi.

Jan. 23, 1995.

David R. Hunt, Ross, Hunt, Spell and Ross, Clarksdale, MS, for Juanita Winchester.

Jim Greenlee, Assistant U.S. Attorney, Oxford, MS, for Commodity Credit Corporation and United States Department of Agriculture, Agricultural Stabilization and Conservation Service.

## OPINION

DAVID W. HOUSTON, III, Bankruptcy Judge.

On consideration before the court in the above captioned adversary proceeding is the issue of the assessment of attorney's fees and expenses incurred by the plaintiff, Juanita C. Winchester, individually, and as executrix of the estate of Clarence E. Winchester, as a result of the willful violation of the automatic stay by the named defendants. The court has reviewed the fee request submitted by the plaintiff and the response filed by the defendants; having considered same, the court hereby finds as follows, to-wit:

### I.

The court has jurisdiction of the subject matter of and the parties to this proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. That portion of the plaintiff's complaint seeking redress for the defendants' violation of the automatic stay is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A) and (O).

### II.

The factual scenario related to this proceeding essentially involves two farms which are located adjacent to each other in Quitman County, Mississippi:

Farm No. 738—Operated by C & B Farms, Inc., a corporation owned by Clarence E. Winchester and his son, Bradley Winchester.

Farm No. 425—Operated exclusively by Clarence E. Winchester, individually.

Both farms were leased during calendar year 1988, either directly or indirectly, from the Mississippi Department of Corrections.

On March 10, 1988, Clarence E. Winchester, executed a contract with the defendants to participate in the 1988 farm programs, including the deficiency and disaster programs for both rice and soybeans. On May 16, 1988, pursuant to an application filed by Mr. Winchester, the defendants made an advance payment under the 1988 rice disaster program in the sum of $6,449.00.

Quitman County was subsequently certified as a disaster area for the 1988 crop year. Mrs. Winchester alleges in her complaint that her husband should have been entitled to receive a total rice disaster payment, applicable to Farm No. 425, in the sum of $35,718.90. After deducting the aforementioned advance payment, she contends that the defendants still owe the balance of $29,269.90.

On August 17, 1988, the Quitman County ASCS Committee (County Committee) met and rendered a decision reducing the yields on both farms, for purposes of calculating the rice disaster payments, to the actual production realized during 1988, which was zero. This decision effectively meant that neither Mr. Winchester nor C & B Farms, Inc., would receive any funds from the rice disaster program. Also because of this action, the defendants took the position that the advance payment in the sum of $6,449.00 should be refunded by Mr. Winchester.

On September 15, 1988, J.R. Boyd, Jr., the ASCS County Executive Director for Quitman County, mailed a letter to Mr. Winchester, at an incorrect mailing address, purporting to advise him of the County Committee's decision relative to both his farm and the farm operated by C & B Farms, Inc. Pertinent excerpts from this letter are set forth as follows:

> Due to numerous reports from the public, I made a visit to your farms 425 and 738 on July 18 and inspected your rice crop.
>
> The following observations were made:
>
> Farm 425

> 1. Weeds and vegetation were 4 to 5 feet tall and rice could not be identified without getting in the field.
> 2. All fields were dry. No water was being pumped. Fields on the south end did not appear to have had any water at any time this year.
> 3. There was no evidence that any herbicides had been applied.
>
> Farm 738
> 1. Vegetation was not as large on this place but it had not been controlled.
> 2. There was evidence that some kind of herbicide had been applied on some of the area.
> 3. I did not see a single levee that had been butted up.
> 4. There was no evidence of any water having been applied all year to any fields.
>
> This information was presented to the County Committee on August 17, 1988. Donald Respess, Vice Chairman of the committee, stated that he sees some of your rice crop every day. He has also seen the rice on farm 738. He verified the conditions that I reported to the committee.
>
> After reviewing the above information, the committee determined that normal cultural practices for the production of rice has not been carried out on your farms. ASCS procedure requires that when normal cultural practices have not been performed, the farm payment yield must be reduced to the yield that could be expected from practices actually performed. Therefore, this is to inform you that the committee determined that your 1988 rice payment yield will be reduced to the actual yield that you produce. Please submit your rice production immediately after harvesting.

Mr. and Mrs. Winchester filed their voluntary Chapter 12 bankruptcy petition on June 9, 1989.

The parties do not dispute that Mr. Winchester was entitled to receive a disaster payment relative to the 1988 soybean crop in the sum of $10,427.00. Subsequent to the Winchesters' filing bankruptcy and without obtaining relief from the automatic stay, the

defendants admittedly offset an amount equal to the rice advance payment, i.e., $6,449.00, against the aforementioned soybean disaster entitlement, and remitted to Mr. Winchester the net sum of $3,978.00.

As a result of the unfavorable decision of the County Committee regarding Mr. Winchester's rice payment, several administrative hearings took place. A thorough discussion and chronology of the administrative processes were set forth in a prior opinion of this court dated October 4, 1991. That opinion is incorporated herein by reference. In addition, the conclusions reached by the ASCS County Committee are highly suspect. The stipulations of fact, which were agreed to by the parties and which were incorporated in the pre-trial order entered in this proceeding, largely belie the County Committee's initial determination.

### III.

■ The court is of the opinion that the defendants willfully violated 11 U.S.C. § 362(a)(7) when they caused the $6,449.00, owed to Mr. Winchester on the 1988 soybean disaster entitlement, to be withheld. This was done subsequent to the filing of the Chapter 12 petition and clearly without the approval of the court.

11 U.S.C. § 362(a)(7) provides:

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of—

(7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor;

The defendants candidly admit the factual circumstances surrounding the setoff. In a letter dated June 30, 1989, the ASCS County Executive Director acknowledged that the defendants were withholding from the soybean proceeds a sum equivalent to the advance rice payment because they considered that Winchester was not entitled to anything as a result of the rice disaster program.

ASCS and CCC defend this part of the plaintiff's complaint relying on 7 C.F.R. § 1403.8 (1992), which provides as follows:

§ 1403.8  Withholding.

(a) Withholding of a payment prior to the completion of an applicable offset procedure may be made from amounts payable to a debtor by CCC to ensure that the interests of CCC and the United States will be protected as provided in this section.

(b) A payment may be withheld to protect the interests of CCC or the United States only if CCC determines that:

(1) There has been a serious breach of contract or violation of program requirements and the withholding action is considered necessary to protect the financial interests of CCC;

(2) There is substantial evidence of violations of criminal or civil frauds statutes and criminal prosecution or civil frauds action is of primary importance to program operations of CCC;

(3) Prior experience with the debtor indicates that collection will be difficult if amounts payable to the debtor are not withheld;

(4) There is doubt that the debtor will be financially able to pay a judgment on the claim of CCC;

(5) The facts available to CCC are insufficient to determine the amount to be offset or the proper payee;

(6) A judgment on a claim of CCC has been obtained; or

(7) Such action has been requested by the Department of Justice.

(c) Except for debts due CCC or ASCS, withholding action by CCC on amounts payable to debtors of other Government agencies may not be made unless requested by the Department of Justice.

■ This regulation clearly does not supersede the automatic stay provisions of the Bankruptcy Code, nor does it even contemplate a debtor's bankruptcy filing. The defendants argue that the withholding/setoff was not intentional or willful. The court is of the opinion that this argument is without

merit. The defendants' conduct cannot be compared to a bank's "administrative freeze" of a debtor's bank account, which most courts feel is a violation of the automatic stay regardless. See, *In re Strumpf,* 37 F.3d 155 (4th Cir.1994). The defendants owed Mr. Winchester the balance of his 1988 soybean disaster payment and clearly offset the rice advance payment without court approval. They never tendered the money to the registry of the court or to the Chapter 12 trustee.

Ironically, long after unilaterally effectuating the setoff, the defendants filed a motion seeking relief from the automatic stay, asking this court to allow the setoff. If they truly believed in the aforementioned regulation, why did they do this? The court, following a hearing conducted on February 12, 1991, denied this motion because the setoff had already occurred. The court refused to bless an obvious violation of the automatic stay "after the fact."

■ The setoff also occurred at a time before a *final administrative determination* had been made as to the correctness of the County Committee's decision to deny Mr. Winchester the rice disaster payment. This is indicative that there was no definitive mutuality of obligations between the parties as required by § 553(a) of the Bankruptcy Code.

The decision of this court was appealed by the defendants to the United States District Court and was affirmed on March 28, 1994. A further appeal to the Court of Appeals for the Fifth Circuit was taken on May 26, 1994.

The court reserved for further consideration the issue of the plaintiff's damages, which consist now of only attorney's fees and expenses.

### IV.

■ Because of the United States Supreme Court decisions rendered in *Hoffman v. Connecticut Department of Income Maintenance,* 492 U.S. 96, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989), and *United States v. Nordic Village,* 503 U.S. 30, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992), this court was concerned as to whether an award of monetary damages could be rendered against the defendants. The passage of the Bankruptcy Reform Act of 1994, Public Law 103–394 (H.R. 5116), on October 22, 1994, resolved this issue. Particularly § 113 of this Act amended 11 U.S.C. § 106 to read as follows:

§ 106.   Waiver of sovereign immunity

(a) Notwithstanding as assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to the following:

(1) Sections 105, 106, 107, 108, 303, 346, 362, 363, 364, 365, 366, 502, 503, 505, 506, 510, 522, 523, 524, 525, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, 552, 553, 722, 724, 726, 728, 744, 749, 764, 901, 922, 926, 928, 929, 944, 1107, 1141, 1142, 1143, 1146, 1201, 1203, 1205, 1206, 1227, 1231, 1301, 1303, 1305, and 1327 of this title.

(2) The court may hear and determine any issue arising with respect to the application of such sections to governmental units.

(3) The court may issue against a governmental unit an order, process, or judgment under such sections or the Federal Rules of Bankruptcy Procedure, including an order or judgment awarding a money recovery, but not including an award of punitive damages.   Such order or judgment for costs or fees under this title or the Federal Rules of Bankruptcy Procedure against any governmental unit shall be consistent with the provisions and limitations of section 2412(d)(2)(A) of title 28.

(4) The enforcement of any such order, process, or judgment against any governmental unit shall be consistent with appropriate nonbankruptcy law applicable to such governmental unit and, in the case of a money judgment against the United States, shall be paid as if it is a judgment rendered by a district court of the United States.

(5) Nothing in this section shall create any substantive claim for relief or cause of action not otherwise existing under this title, the Federal Rules of Bankruptcy Procedure, or nonbankruptcy law.

(b) A governmental unit that has filed a proof of claim in the case is deemed to have waived sovereign immunity with re-

spect to a claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which the claim of such governmental unit arose.

(c) Notwithstanding any assertion of sovereign immunity by a governmental unit, there shall be offset against a claim or interest of a governmental unit any claim against such governmental unit that is property of the estate.

Section 702(2)(B) of the Bankruptcy Reform Act of 1994 dealt with the effective date of the amendment to 11 U.S.C. § 106 as follows:

The amendments made by Section 113 and 117 shall apply with respect to cases commenced under Title 11 of the United States Code before, on, and after the date of enactment of this act.

Clearly, the amended section applies to this case and permits this court to assess monetary damages against the defendants.

■ The amended section also provides guidance for the assessment of attorney's fees and expenses, stating that any order or judgment for cost or fees against any governmental unit shall be consistent with the provisions and limitations of 28 U.S.C. § 2412(d)(2)(A), a part of the Equal Access to Justice Act.

Title 28 U.S.C. § 2412(d)(2)(A) provides as follows:

(A) "fees and other expenses" includes the reasonable expenses of expert witnesses, the reasonable cost of any study, analysis, engineering report, test, or project which is found by the court to be necessary for the preparation of the party's case, and reasonable attorney fees (The amount of fees awarded under this subsection shall be based upon prevailing market rates for the kind and quality of the services furnished, except that (i) no expert witness shall be compensated at a rate in excess of the highest rate of compensation for expert witnesses paid by the United States; and (ii) attorney fees shall not be awarded in excess of $75 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the

proceedings involved, justifies a higher fee.);

The aforementioned section provides that the court may increase the $75.00 per hour rate for attorney's fees specified in the statute to reflect an increase in the cost of living since October 1, 1981, the effective date of the Equal Access to Justice Act. Numerous courts have applied the "all items" component of the Consumer Price Index as the appropriate inflation escalator when construing § 2412(d)(2)(A). See, *Wonders v. Shalala,* 822 F.Supp. 1345 (E.D.Wis.1993), *Harris v. Sullivan,* 968 F.2d 263 (2nd Cir.1992); *Dewalt v. Sullivan,* 963 F.2d 27 (3rd Cir. 1992); *Sullivan v. Sullivan,* 958 F.2d 574 (4th Cir.1992); *Russell v. Sullivan,* 930 F.2d 1443 (9th Cir.1991); and *Johnson v. Sullivan,* 919 F.2d 503 (8th Cir.1990). Counsel for the plaintiff has charged at the rate of $90.00 per hour for attorney's fees. Considering the rise in the Consumer Price Index since 1981, the court is of the opinion that this rate is reasonable and within the parameters of § 2412(d)(2)(A).

## V.

■ The court will now address the plaintiff's specific request for an award of attorney's fees and reimbursement of expenses incurred during her representation to redress the defendants' violation of the automatic stay.

An examination of the fee application submitted by the attorneys representing Mrs. Winchester reveals that fees were incurred for the following services, to-wit:

| | |
|---|---:|
| 1. Initial discussions regarding employment to pursue the claims of Mr. Winchester against the defendants | $ 724.50 |
| 2. Responding to the violation of the automatic stay by the defendants | 5,719.50 |
| 3. Services rendered in connection with the defendant's efforts to lift the automatic stay "after the fact" to permit setoff; motion for setoff filed by the defendants; appeal of bankruptcy court rulings | 13,140.00 |

4. Services rendered in connection with asserting the claim against the defendants for the violation of the automatic stay and the claim to recover the balance of the 1988 rice disaster payment ... 15,007.50

5. Fees interrelated to the aforementioned four categories which cannot specifically be separated ... 1,494.00

6. Proceedings before ASCS County Committee subsequent to October 12, 1994, bankruptcy court decision ... 1,215.00

Total Fees ... $37,300.50

Total Expenses ... $ 4,017.81

Total Fees and Expenses ... $41,318.41

In the opinion of the court, the defendants have attempted to overwhelm Mrs. Winchester throughout the course of this litigation with protracted motions, appeals, affirmative defenses, motions for reconsideration, etc. Without belaboring this point, the defendants have significantly escalated the time expended by everyone with legal maneuverings at every opportunity. The court must, therefore, balance the fact that the defendants by their own actions have caused the plaintiff to incur much larger attorney's fees against the fact that the amount initially setoff by the defendants was only $6,449.00.

■ Having thoroughly reviewed the fee application, the court is of the opinion that reasonable attorney's fees and expenses should be awarded to the plaintiff as follows:

Attorney's fees (140 hours @ $90.00/hr.) ... $12,600.00

Expenses ... 1,339.29

Total Award ... $13,939.29

■ In rendering this decision, the court considered the applicability of the *Johnson* factors found in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974), which were made applicable to bankruptcy proceedings by *Matter of First Colonial Corp. of America,* 544 F.2d 1291 (5th Cir.1977). More importantly, the court considered the following factors:

1. The relevant time expended by the plaintiff's attorneys multiplied by the requested hourly rate.

2. The dollar amount actually setoff by the defendants.

3. The zealous conduct of the defendants, which resulted in significant excess hours being expended by the plaintiff's attorneys.