# UNITED STATES *v.* NORDIC VILLAGE, INC.

No. 90–1629.   Argued December 9, 1991—Decided February 25, 1992

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, O'CONNOR, KENNEDY, SOUTER, and THOMAS, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BLACKMUN, J., joined, *post*, p. 39.

*Richard H. Seamon* argued the cause for the United States. With him on the briefs were *Solicitor General Starr, Assistant Attorney General Peterson, Deputy Solicitor General Roberts, Gary D. Gray,* and *John A. Dudeck, Jr.*

*Marvin A. Sicherman* argued the cause and filed a brief for respondent. With him on the brief was *Michael D. Zaverton.*

JUSTICE SCALIA delivered the opinion of the Court.

This case presents a narrow question: Does § 106(c) of the Bankruptcy Code waive the sovereign immunity of the United States from an action seeking monetary recovery in bankruptcy?

I

Respondent Nordic Village, Inc., filed a petition for relief under Chapter 11 of the Bankruptcy Code in March 1984. About four months later, Josef Lah, an officer and shareholder of Nordic Village, drew a $26,000 check on the company's corporate account, $20,000 of which was used to obtain a cashier's check in that amount payable to the Internal Revenue Service (IRS). Lah delivered this check to the IRS and directed it to apply the funds against his individual tax liability, which it did.

In December 1984, the trustee appointed for Nordic Village commenced an adversary proceeding in the Bankruptcy Court for the Northern District of Ohio, seeking to recover, among other transfers, the $20,000 paid by Lah to the IRS. The Bankruptcy Court permitted the recovery. The unauthorized, postpetition transfer, the court determined, could be avoided under § 549(a) and recovered from the IRS under § 550(a) of the Bankruptcy Code. It entered a judgment against the IRS in the amount of $20,000, which the District Court affirmed.

A divided panel of the United States Court of Appeals for the Sixth Circuit affirmed. 915 F. 2d 1049 (1990). It upheld the reasoning of the lower courts and rejected a jurisdictional defense (raised for the first time on appeal) that sovereign immunity barred the judgment entered against the Government. We granted certiorari. 501 U. S. 1216 (1991).

## II

Section 106 of the Bankruptcy Code provides:

"(a) A governmental unit is deemed to have waived sovereign immunity with respect to any claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which such governmental unit's claim arose.

"(b) There shall be offset against an allowed claim or interest of a governmental unit any claim against such governmental unit that is property of the estate.

"(c) Except as provided in subsections (a) and (b) of this section and notwithstanding any assertion of sovereign immunity—

"(1) a provision of this title that contains 'creditor,' 'entity,' or 'governmental unit' applies to governmental units; and

"(2) a determination by the court of an issue arising under such a provision binds governmental units." 11 U. S. C. § 106.

Three Terms ago we construed this provision in *Hoffman* v. *Connecticut Dept. of Income Maintenance,* 492 U. S. 96 (1989). The issue there was whether § 106(c) authorizes a monetary recovery against a State. We held that it does not, though the Justices supporting that judgment failed to agree as to why. A plurality of the Court determined that § 106(c) does not permit a bankruptcy court to issue mone-

tary relief against a State. *Id.*, at 102 (WHITE, J., joined by REHNQUIST, C. J., and O'CONNOR and KENNEDY, JJ.). That conclusion, the plurality said, was compelled by the language of § 106(c), the relationship between that subsection and the rest of the statute, and the requirement that congressional abrogation of the States' Eleventh Amendment immunity be clearly expressed. The concurrence found it unnecessary to construe the statute, concluding that Congress lacks authority under the Bankruptcy Clause to abrogate the States' immunity from money-damages actions. *Id.*, at 105 (SCALIA, J., concurring in judgment). Like the Court of Appeals here, a dissent determined that the language of § 106(c), particularly that of paragraph (c)(1), supplies the necessary waiver. *Id.*, at 106 (Marshall, J., joined by Brennan, BLACKMUN, and STEVENS, JJ.).

Contrary to the Government's suggestion, *Hoffman* does not control today's decision. It is true, to be sure, that Congress made clear in § 106 that (insofar as is within Congress' power) state and federal sovereigns are to be treated the same for immunity purposes. See 11 U. S. C. § 101(27) (1982 ed., Supp. II) ("'governmental unit' means United States [and] State"). Since, however, the Court in *Hoffman* was evenly divided over what that treatment *was* as to the States; and since the deciding vote of the concurrence, denying amenability to suit, rested upon a ground (the Eleventh Amendment) applicable only to the States and not to the Federal Government, see *Federal Housing Authority* v. *Burr*, 309 U. S. 242, 244 (1940); the holding in *Hoffman* has no binding force here. The separate opinions dealing with the statutory question are relevant, however, and we shall in fact rely on the reasoning of the plurality.

## III

Waivers of the Government's sovereign immunity, to be effective, must be "'unequivocally expressed.'" *Irwin* v.

*Department of Veterans Affairs,* 498 U. S. 89, 95 (1990) (quoting *United States* v. *Mitchell,* 445 U. S. 535, 538 (1980), and *United States* v. *King,* 395 U. S. 1, 4 (1969)). Contrary to respondent's suggestion, moreover, they are not generally to be "liberally construed." We have on occasion narrowly construed exceptions to waivers of sovereign immunity where that was consistent with Congress' clear intent, as in the context of the "sweeping language" of the Federal Tort Claims Act, *United States* v. *Yellow Cab Co.,* 340 U. S. 543, 547 (1951), see, *e. g., id.,* at 554–555, *Block* v. *Neal,* 460 U. S. 289, 298 (1983), *United States* v. *Aetna Casualty & Surety Co.,* 338 U. S. 366, 383 (1949), or as in the context of equally broad "sue and be sued" clauses, see, *e. g., Franchise Tax Bd. of California* v. *United States Postal Service,* 467 U. S. 512, 517–519 (1984), *FHA* v. *Burr, supra,* at 245. These cases do not, however, eradicate the traditional principle that the Government's consent to be sued "must be 'construed strictly in favor of the sovereign,' *McMahon* v. *United States,* 342 U. S. 25, 27 (1951), and not 'enlarge[d] . . . beyond what the language requires,'" *Ruckelshaus* v. *Sierra Club,* 463 U. S. 680, 685 (1983) (quoting *Eastern Transportation Co.* v. *United States,* 272 U. S. 675, 686 (1927)), a rule of construction that we have had occasion to reaffirm once already this Term, see *Ardestani* v. *INS,* 502 U. S. 129, 137 (1991).

Subsections (a) and (b) of § 106 meet this "unequivocal expression" requirement with respect to monetary liability. Addressing "claim[s]," which the Code defines as "right[s] to payment," § 101(4)(A), they plainly waive sovereign immunity with regard to monetary relief in two settings: compulsory counterclaims to governmental claims, § 106(a); and permissive counterclaims to governmental claims capped by a setoff limitation, § 106(b). Next to these models of clarity stands subsection (c). Though it, too, waives sovereign immunity, it fails to establish unambiguously that the waiver extends to monetary claims. It is susceptible of at least two interpretations that do *not* authorize monetary relief.

Under one interpretation, § 106(c) permits the bankruptcy court to issue "declaratory and injunctive"—though not monetary—relief against the Government. *Hoffman,* 492 U. S., at 102. This conclusion is reached by reading the two paragraphs of subsection (c) as complementary rather than independent: The first paragraph identifies the subject matter of disputes that courts may entertain under the subsection and the second paragraph describes the relief that courts may grant in such disputes. That is to say, the second paragraph specifies the *manner* in which there shall be applied to governmental units the provisions identified by the first paragraph, *i. e.,* a manner that permits declaratory or injunctive relief but not an affirmative monetary recovery.

Several factors favor this construction. The distinction it establishes—between suits for monetary claims and suits for other relief—is a familiar one, and is suggested by the contrasting language used in subsections (a) and (b) ("claim[s]") and in subsection (c) ("determination[s]" of "issue[s]"), *Hoffman,* 492 U. S., at 102. It also avoids eclipsing the carefully drawn limitations placed on the waivers in subsections (a) and (b). The principal provision of the Code permitting the assertion of claims against persons other than the estate itself is § 542(b), which provides that "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee." If the first paragraph of § 106(c) means that, by reason of use of the trigger word "entity," this provision applies *in all respects* to governmental units, then the Government may be sued on all alleged debts, despite the prior specification in subsections (a) and (b) that claims against the Government will lie only when the Government has filed a proof of claim, and even then only as a setoff unless the claim is a compulsory counterclaim. Those earlier limitations are reduced to trivial application if paragraph (c)(1) stands on its own. See *id.,* at 101–102. This construction also attaches practical consequences to para-

graph (c)(2), whereas respondent's interpretation violates the settled rule that a statute must, if possible, be construed in such fashion that every word has some operative effect. See *id.*, at 103; *United States* v. *Menasche,* 348 U. S. 528, 538–539 (1955). Respondent has suggested no function to be performed by paragraph (2) if paragraph (1) operates to treat the Government like any other "entity" or "creditor," regardless of the type of relief authorized by an applicable Code provision.

Under this interpretation, § 106(c), though not authorizing claims for monetary relief, would nevertheless perform a significant function. It would permit a bankruptcy court to determine the amount and dischargeability of an estate's liability to the Government, such as unpaid federal taxes, see 11 U. S. C. § 505(a)(1) (permitting the court to *"determine* the amount or legality of any tax") (emphasis added), whether or not the Government filed a proof of claim. See 492 U. S., at 102–103. Cf. *Neavear* v. *Schweiker,* 674 F. 2d 1201, 1203–1204 (CA7 1982) (holding that under § 106(c) a bankruptcy court could discharge a debt owed to the Social Security Administration). The Government had repeatedly objected, on grounds of sovereign immunity, to being bound by such determinations before § 106(c) was enacted in 1978. See, *e. g., McKenzie* v. *United States,* 536 F. 2d 726, 728–729 (CA7 1976); *Bostwick* v. *United States,* 521 F. 2d 741, 742–744 (CA8 1975); *Gwilliam* v. *United States,* 519 F. 2d 407, 410 (CA9 1975); *In re Durensky,* 377 F. Supp. 798, 799–800 (ND Tex. 1974), appeal dism'd, 519 F. 2d 1024 (CA5 1975).

Subsection (c) is also susceptible of another construction that would not permit recovery here. If the two paragraphs of § 106(c) are read as being independent, rather than the second as limiting the first, then, pursuant to the first paragraph, Code provisions using the triggering words enumerated in paragraph (c)(1) would apply fully to governmental units. But that application of those provisions would be limited by the requirements of subsections (a) and (b), in accord-

ance with the phrase that introduces subsection (c) ("Except as provided in subsections (a) and (b) of this section"). This exception, in other words, could be read to mean that the rules established in subsections (a) and (b) for waiver of Government "claim[s]" that are "property of the estate" are exclusive, and preclude any resort to subsection (c) for that purpose. That reading would bar the present suit, since the right to recover a postpetition transfer under § 550 is clearly a "claim" (defined in § 101(4)(A)) and is "property of the estate" (defined in § 541(a)(3)). (The dissent appears to read paragraphs (c)(1) and (c)(2) as being independent but provides no explanation of what the textual exception could mean under that reading.)

The foregoing are assuredly not the only readings of subsection (c), but they are plausible ones—which is enough to establish that a reading imposing monetary liability on the Government is not "unambiguous" and therefore should not be adopted. Contrary to respondent's suggestion, legislative history has no bearing on the ambiguity point. As in the Eleventh Amendment context, see *Hoffman, supra,* at 104, the "unequivocal expression" of elimination of sovereign immunity that we insist upon is an expression in statutory text. If clarity does not exist there, it cannot be supplied by a committee report. Cf. *Dellmuth* v. *Muth,* 491 U. S. 223, 228–229 (1989).

## IV

Respondent proposes several alternative grounds for affirming the judgment below, all unpersuasive. First, it claims that the necessary waiver can be found in 28 U. S. C. § 1334(d), which grants the district court in which a bankruptcy case is initiated "exclusive jurisdiction of all of the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate." Respondent urges us to construe this language as empowering a bankruptcy court to compel the United States or a State to return any property, including money, that passes into the

estate upon commencement of the bankruptcy proceeding. Under this theory, a sovereign's exposure to suit would not be governed by the specific language of § 106, but would be concealed in the broad jurisdictional grant of § 1334(d). Besides being unprecedented and running afoul of the unequivocal-expression requirement, this theory closely resembles an argument we rejected just last Term. In *Blatchford* v. *Native Village of Noatak*, 501 U. S. 775, 786 (1991), the argument was made that Alaska's Eleventh Amendment immunity to suit was abrogated by 28 U. S. C. § 1362, a jurisdictional grant, akin to § 1334(d), that gives district courts jurisdiction over "all civil actions, brought by any Indian tribe . . . aris[ing] under the Constitution, laws, or treaties of the United States." Rejecting that contention, we observed: "The fact that Congress grants *jurisdiction* to hear a claim does not suffice to show Congress has abrogated all *defenses* to that claim. The issues are wholly distinct." *Id.*, at 787, n. 4.

Equally unpersuasive is respondent's related argument that a bankruptcy court's *in rem* jurisdiction overrides sovereign immunity. As an initial matter, the premise for that argument is missing here, since respondent did not invoke, and the Bankruptcy Court did not purport to exercise, *in rem* jurisdiction. Respondent sought to recover a sum of money, not "particular dollars," cf. *Begier* v. *IRS*, 496 U. S. 53, 62 (1990) (emphasis deleted), so there was no *res* to which the court's *in rem* jurisdiction could have attached, see *Pennsylvania Turnpike Comm'n* v. *McGinnes*, 268 F. 2d 65, 66–67 (CA3), cert. denied, 361 U. S. 829 (1959). In any event, we have never applied an *in rem* exception to the sovereign-immunity bar against monetary recovery, and have suggested that no such exception exists, see *United States* v. *Shaw*, 309 U. S. 495, 502–503 (1940). Nor does *United States* v. *Whiting Pools, Inc.*, 462 U. S. 198 (1983), establish such an exception, or otherwise permit the relief requested here. That case upheld a Bankruptcy Court order that the IRS

turn over tangible property of the debtor it had seized before the debtor filed for bankruptcy protection. A suit for payment of funds from the Treasury is quite different from a suit for the return of tangible property in which the debtor retained ownership. The Court's opinion in *Whiting Pools* contains no discussion of § 106(c), and nothing in it suggests that an order granting monetary recovery from the United States would be proper.

Resort to the principles of trust law is also of no help to respondent. Most of the trust decisions respondent cites are irrelevant, since they involve private entities, not the Government. The one that does involve the Government, *Bull* v. *United States*, 295 U. S. 247 (1935), concerns equitable recoupment, a doctrine that has been substantially narrowed by later cases, see *United States* v. *Dalm*, 494 U. S. 596, 608 (1990), and has no application here.

\* \* \*

Neither § 106(c) nor any other provision of law establishes an unequivocal textual waiver of the Government's immunity from a bankruptcy trustee's claims for monetary relief. Since Congress has not empowered a bankruptcy court to order a recovery of money from the United States, the judgment of the Court of Appeals must be reversed.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE BLACKMUN joins, dissenting.

The injustice that the Court condones today demonstrates that it is time to reexamine the wisdom of the judge-made rules that drive its decision.

An officer of an insolvent corporation appropriated corporate funds and used them to discharge a personal tax obligation. Because the Federal Government was the ultimate recipient of the stolen property, the Court holds that the

bankruptcy trustee cannot avoid the transfer. The interest in a rigid interpretation of the doctrine of sovereign immunity outweighs the interest in equitable treatment of general creditors and shareholders of the corporate debtor. This result is neither necessary nor just.

It is not necessary because both the text and the legislative history of the Bankruptcy Code support a contrary result. It is not just because nothing more than a misguided interest in adherence to obsolete judge-made rules is at stake. I shall comment first on the laws enacted by Congress and then on the rules that the Court itself has ordained.

## I

The text of § 106 is straightforward. Because the case does not involve either a counterclaim or an offset, subsections (a) and (b) are not applicable. Subsection (c) provides:

> "(c) Except as provided in subsections (a) and (b) of this section and notwithstanding any assertion of sovereign immunity—
>
> "(1) a provision of this title that contains 'creditor,' 'entity,' or 'governmental unit' applies to governmental units; and
>
> "(2) a determination by the court of an issue arising under such a provision binds governmental units." 11 U. S. C. § 106(c).

The United States is a "governmental unit,"[1] and therefore any provision of the Bankruptcy Code that contains one of the "trigger words" listed in paragraph (c)(1) applies to the United States. Section 550(a) is undoubtedly one such pro-

---

[1] Section 101(27) defines the term "governmental unit" to include the "United States [and any] department, agency, or instrumentality of the United States." 11 U. S. C. § 101(27) (1988 ed., Supp. II).

vision.[2]  Thus, "notwithstanding any assertion of sovereign immunity," paragraph (c)(1) provides that § 550(a) "applies" to the United States, and paragraph (c)(2) provides that the Government is bound by the court's determination of the issues arising under that provision.  The literal text of the Act unquestionably forecloses the defense of sovereign immunity.

The legislative history unambiguously demonstrates that Congress intended the statute to be read literally.  The immediate purpose of § 106(c) was to enable the bankruptcy court to determine the amount and the dischargeability of the debtor's tax liabilities, but the sponsors of the amendment clearly stated that it covered "other matters as well," specifically including the avoidance of preferential transfers. 124 Cong. Rec. 32394 (1978) (statement of Rep. Edwards); *id.*, at 33993 (statement of Sen. DeConcini).[3]  The congressional purpose to waive sovereign immunity is pellucidly clear.

The Court evades this conclusion by hypothesizing "plausible" alternative constructions of the statute,[4] by refusing to consider its legislative history,[5] and by reiterating the

---

[2] Section 550(a) provides:

"(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

"(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

"(2) any immediate or mediate transferee of such initial transferee."

[3] See also the material summarized and quoted in my dissenting opinion in *Hoffman* v. *Connecticut Dept. of Income Maintenance*, 492 U. S. 96, 111–114 (1989).  Particularly note the sponsors' comment that "'§ 106(c) permits a trustee or debtor in possession to assert avoiding powers under Title 11 against a governmental unit,'" *id.*, at 112, and the comment that as a result of § 106(c) "'the government is subject to avoidance of preferential transfers,'" *id.*, at 113.

[4] *Ante*, at 34–37.

[5] *Ante*, at 37.

Court's view that waivers of sovereign immunity must be strictly construed.[6]   I shall not comment on the plausible alternatives except to note that they are obviously less satisfactory—both as a matter of sound bankruptcy policy and as a principled interpretation of the English language—than a literal reading of the statute.   I shall, however, add a few words about the Court's love affair with the doctrine of sovereign immunity.

## II

Despite its ancient lineage, the doctrine of sovereign immunity is nothing but a judge-made rule that is sometimes favored[7] and sometimes disfavored.[8]   Its original reliance on the notion that a divinely ordained monarch "can do no wrong"[9] is, of course, thoroughly discredited.[10]   Moreover,

---

[6] *Ante*, at 34.

[7] See, *e. g., Library of Congress* v. *Shaw*, 478 U. S. 310, 318 (1986) (" 'The consent necessary to waive the traditional immunity must be express, and it must be strictly construed' ") (quoting *United States* v. *N. Y. Rayon Importing Co.*, 329 U. S. 654, 659 (1947)); *Ruckelshaus* v. *Sierra Club*, 463 U. S. 680, 685 (1983) ("Waivers of immunity must be 'construed strictly in favor of the sovereign,' . . . and not 'enlarge[d] . . . beyond what the language requires' "); *United States* v. *Sherwood*, 312 U. S. 584, 590 (1941) (Because "a relinquishment of a sovereign immunity . . . must be strictly interpreted," we construe the statutory language with "conservatism").

[8] See, *e. g., Block* v. *Neal*, 460 U. S. 289, 298 (1983) (" 'The exemption of the sovereign from suit involves hardship enough where consent has been withheld.   We are not to add to its rigor by refinement of construction where consent has been announced' ") (quoting *Anderson* v. *Hayes Constr. Co.*, 243 N. Y. 140, 147, 153 N. E. 28, 29–30 (1926) (Cardozo, J.)); *Indian Towing Co.* v. *United States*, 350 U. S. 61, 69 (1955) (Frankfurter, J.) (Court should not be "a self-constituted guardian of the Treasury [and] import immunity back into a statute designed to limit it"); *Canadian Aviator, Ltd.* v. *United States*, 324 U. S. 215, 222 (1945) (Court should not thwart the "broad statutory language authorizing suit" against the United States with "an unduly restrictive interpretation").

[9] See 1 W. Blackstone, Commentaries *246.

[10] See, *e. g., Nevada* v. *Hall*, 440 U. S. 410, 415 (1979) (the fiction that the king could do no wrong "was rejected by the colonists when they declared

its persistent threat to the impartial administration of justice has been repeatedly acknowledged and recognized.[11]   Thus, in *Federal Housing Authority* v. *Burr*, 309 U. S. 242, 245 (1940), we remarked on "the current disfavor of the doctrine of governmental immunity from suit."[12]

Time after time Congress has taken action to ameliorate the hardship of the doctrine.  A half century ago this Court observed:

> "A sense of justice has brought a progressive relaxation by legislative enactments of the rigor of the immunity rule.  As representative governments attempt to ameliorate inequalities as necessities permit, prerogatives of the government yield to the needs of the citizen. . . . When authority is given, it is liberally construed."
> *United States* v. *Shaw*, 309 U. S. 495, 501 (1940).

In the bankruptcy context, the Court has noted that there is no reason why the Federal Government should be treated

their independence from the Crown"); *Langford* v. *United States*, 101 U. S. 341, 343 (1880) ("We do not understand that . . . the English maxim [that the king can do no wrong] has an existence in this country").

[11] See, *e. g.*, Davis, Sovereign Immunity Must Go, 22 Admin. L. Rev. 383, 383–384, 389–393 (1969); Pugh, Historical Approach to the Doctrine of Sovereign Immunity, 13 La. L. Rev. 476, 492 (1953); Borchard, Government Liability in Tort, 34 Yale L. J. 1, 1–2, 31, 33 (1924).

[12] Many legal scholars have been similarly critical of the doctrine.  See, *e. g.*, Comment, Sovereign Immunity—An Anathema to the "Constitutional Tort," 12 Santa Clara Law. 543, 553, and n. 60 (1972) (collecting authorities); Cramton, Nonstatutory Review of Federal Administrative Action: The Need for Statutory Reform of Sovereign Immunity, Subject Matter Jurisdiction, and Parties Defendant, 68 Mich. L. Rev. 387, 418–419 (1970); Davis, *supra* n. 11; Pugh, *supra* n. 11, at 494.

Recognizing the lack of current justification for and the inequities caused by this judicially created doctrine, several state courts have abrogated or limited the immunity of state and local governments.  See Note, Rethinking Sovereign Immunity after *Bivens*, 57 N. Y. U. L. Rev. 597, 603, and n. 26 (1982) (collecting cases).

differently from any other secured creditor.[13]   Its interests are adequately protected by specific statutory provisions governing discharges and priorities.   As the Commission on the Bankruptcy Laws of the United States observed, unanimously, in 1973:

> "The Commission also recommends that unpaid taxes entitled to priority be reduced from those accruing within three years prior to bankruptcy to those accruing within one year prior to bankruptcy and that the government be given no other priority for taxes in a bankruptcy proceeding (including those secured by a 'tax lien').   Data submitted to the Commission by the Treasury Department establishes that the total amount collected by the Federal Government as a result of all of its liens and priorities in bankruptcy proceedings is insignificant in the total federal budget.   It is the view of the Commission that it is unseemly for the Federal Government to insist upon collecting its taxes at the expense of other creditors of the taxpayer, and that the

---

[13] In *United States* v. *Whiting Pools, Inc.*, 462 U. S. 198, 209 (1983), the Court first held that "the reorganization estate includes property of the debtor that has been seized by a creditor prior to the filing of a petition for reorganization."   The Court then explained:

"We see no reason why a different result should obtain when the IRS is the creditor.   The Service is bound by § 542(a) to the same extent as any other secured creditor.   The Bankruptcy Code expressly states that the term 'entity,' used in § 542(a), includes a governmental unit.   § 101(14). See Tr. of Oral Arg. 16.   Moreover, Congress carefully considered the effect of the new Bankruptcy Code on tax collection, see generally S. Rep. No. 95–1106 (1978) (Report of Senate Finance Committee), and decided to provide protection to tax collectors, such as the IRS, through grants of enhanced priorities for unsecured tax claims, § 507(a)(6), and by the nondischarge of tax liabilities, § 523(a)(1).   S. Rep. No. 95–989, pp. 14–15 (1978). Tax collectors also enjoy the generally applicable right under § 363(e) to adequate protection for property subject to their liens.   Nothing in the Bankruptcy Code or its legislative history indicates that Congress intended a special exception for the tax collector in the form of an exclusion from the estate of property seized to satisfy a tax lien." *Ibid.*

only possible justification for this would be a plea of necessity in order to keep the government functioning. As indicated above, such a plea would be totally without foundation in fact.

". . . When the Federal Government enters into business transactions, it should be prepared to deal upon a basis of equality with other creditors of the bankrupt business." Report of Commission on Bankruptcy Laws of the United States, H. R. Doc. No. 93–137, pt. 1, p. 22 (1973).

If these comments by the experts who played a major role in formulating the policies embodied in the Bankruptcy Code are sound—as I believe they are—one must ask what valid reason supports a construction of the waiver in § 106(c) that is so "strict" that the Court will not even examine its legislative history.

Surely the interest in requiring the Congress to draft its legislation with greater clarity or precision does not justify a refusal to make a good-faith effort to ascertain the actual meaning of the message it tried to convey in a statutory provision that is already on the books. The Court's stubborn insistence on "clear statements" burdens the Congress with unnecessary reenactment of provisions that were already plain enough when read literally.[14] The cost to litigants, to

---

[14] One scholar's comment on the countermajoritarian thrust of the Court's fascination with clear statement rules is illustrative:

"In *Dellmuth* v. *Muth*, [491 U. S. 223 (1989),] the Court held that the Education of the Handicapped Act (EHA) of 1975 did not abrogate state immunity. The Court reached this result even though the law imposed substantive obligations directly on the states, included the states in its jurisdictional grant, and included legislative discussion assuming that the states could be sued. After the Supreme Court changed the clear statement rule in 1985, Congress responded in 1986 with a broad textual abrogation of state immunity for statutes protecting the disabled. Yet in *Dellmuth*, the Court held not only that the EHA did not meet the more stringent test for abrogation, but that the 1986 statute made clear Congress' 'intent' not to abrogate state immunity in lawsuits filed before

the legislature, and to the public at large of this sort of judi-. cial lawmaking is substantial and unfortunate. Its impact on individual citizens engaged in litigation against the sovereign is tragic.

The fact that Congress has ample power to correct the Court's unfortunate error does not justify this refusal to obey its command. I respectfully dissent.

1986. Congress overrode *Dellmuth* in 1990. That Congress had to pass the same statute three times to achieve its original goal is quite striking." Eskridge, Overriding Supreme Court Statutory Interpretation Decisions, 101 Yale L. J. 331, 409–410 (1991) (footnotes omitted).