Matthew GLAVIN, et al., Plaintiffs,

v.

William J. CLINTON, et al., Defendants.

Civ. A. No. 98–207–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Sept. 24, 1998.

Edward J. Fuhr, Richard B. Harper, Louanna Godwin, March Dolan Coleman,

Hunton & Williams, Richmond, VA, Michael Carvin, David Thompson, Robert J. Cynkar, Theodore M. Cooperstein, Cooper, Carvin & Rosenthal, PLLC, Washington, DC, L. Lynn Hogue, Valle Simms Dutcher, Southeastern Legal Foundation, Atlanta, GA, for plaintiffs Matthew Glavin, Robert Barr, individually and in his official capacity as a Member of the U.S. House of Representatives, Gary A. Hofmeister, Stephen Gons, James F. McLaughlin, David H. Glavin, John Taylor, Deborah Hardman, Craig Martin, Jim Lacy, Judy Cresanta, Helen V. England, Amie S. Carter, Robert Richard Dennik, Michael T. James, William J. Byrn, individually and in his official capacity as Cobb County Commission Chairman, Cobb County, Georgia, Delaware County, Pennsylvania, DuPage County, Illinois, and Bucks County, Pennsylvania.

Dennis E. Szybala, U.S. Attorney's Office, Alexandria, VA, Dennis G. Linder, Michael Sitcov, Thomas Millet, David Souders, Jennifer Kaplan, D. James Greiner, Attorneys, Civil Division, U.S. Department of Justice, for defendants William J. Clinton, in his capacity as President of the United States, U.S. Department of Commerce, William M. Daley, in his capacity as Secretary of the U.S. Department of Commerce, Bureau of the Census, and James F. Holmes, in his capacity as Acting Director of the Bureau of the Census.

Brian S. Currey, Thomas M. Riordan, Karen Mary Wahle, Alfredo Barrios, Derrick F. Coleman, Andrea J. Worden, Jess B. Frost, David E. Lederman, O'Melveny & Myers LLP, Los Angeles, California, for movants City of Los Angeles, California, City of New York, New York, County of Los Angeles, California, City of Chicago, Illinois, City and County of San Francisco, California, Miami–Dade County, Florida, City of Inglewood, California, City of Houston, Texas, City of San Antonio, Texas, City and County of Denver, Colorado, City of Long Beach, California, City of San Jose, California, City of Stamford, Connecticut, City of Oakland, California, City of Cudahy, California, County of Santa Clara, California, County of San Bernardino, California, County of Alameda, California, County of Riverside, California, State of New Mexico, The U.S. Conference of Mayors, League of Women Voters of Los Angeles, City of Detroit, Michigan, City of Bell, California, City of Gardena, California, City of Huntington Park, California, State of Texas, and the following members of Congress individually and in their official capacities as Members of the U.S. House of Representatives—Carolyn Maloney, Christopher Shays, Tom Sawyer, Rod Blagojevich, Bobby Rush, Luis Gutierrez, John Conyers, Jr., Jose Serrano, Cynthia McKinney, Charles Rangel, Donald Payne, Howard Berman, Xavier Beccera, Loretta Sanchez, Julian Dixon, Henry Waxman, Maxine Waters, Esteban Torres, Sheila Jackson Lee, Robert Menendez, Ed Pastor, Silvestre Reyes, Ciro Rodriguez, and Carlos Romero–Barcelo.

J. Gerald Hebert, J. Gerald Hebert, P.C., Alexandria, VA, Paul M. Smith, Jenner & Block, Washington, DC, for movants Richard A. Gephardt, Danny K. Davis, Juanita Millender–McDonald, Lucille Roybal–Allard, Louise M. Slaughter, and Bennie G. Thompson.

Mary Lou Soller, Miller & Chevalier, Chartered, Washington, DC, Joseph Remcho, Remcho, Johansen & Purcell, San Francisco, California, for movants The Legislature of the State of California, The California Senate, John Burton, individually and as President Pro Tempore of the California Senate, and California Assembly and Antonio Villaraigosa, individually and as Speaker of the California Assembly.

Moses Silverman, Gaines Gwathmey III, Jeannie S. Kang, Victoria W. Ni, Diane Knox, and Linda Y. Yueh, Paul, Weiss, Rifkind, Wharton & Garrison, New York, NY, and Michael Veve, Lasa, Monroig & Veve, Washington, DC, for movants National Korean American Service & Education Consortium, Inc.; Organization of Chinese Americans, Inc.; Organization of Chinese Americans, Los Angeles, California Chapter; Search to Involve Pilipino Americans, Inc.; United Cambodian Community, Inc.; League of United Latin American Citizens; California League of United Latin American Citizens; National Association of Latino Elected and Appointed Officials, Inc.; Mothers of East Los Angeles; Hee–Sook Kim; Adeline M.L. Yoong, Michael Balaoing; Sovann Tith; Johnny Rodriguez; Chayo Zaldivar; Gilberto Flores; and Alvin Parra.

Before WIDENER, Circuit Judge, HILTON, Chief District Judge, and JACKSON, District Judge.

### ORDER

HILTON, Chief Judge.

This matter comes before the Court on the defendants' motion to dismiss and the plaintiffs' motion for summary judgment. For the reasons stated in the accompanying Memorandum Opinion, it is hereby

ORDERED that the plaintiffs' motion for summary judgment is GRANTED, and the defendants' motion to dismiss is DENIED, and it is hereby ORDERED that the defendants are permanently enjoined from using any form of statistical sampling, including their program for non-response follow-up and Integrated Coverage Measurement, to determine the population for purposes of congressional apportionment.

### MEMORANDUM OPINION

This case comes before the Court on the defendants' motion to dismiss and the plaintiffs' motion for summary judgment. Plaintiffs, Matthew Glavin, Robert Barr, Gary A. Hofmeister, Stephen Gons, James F. McLaughlin, David H. Glavin, John Taylor, Deborah Hardman, Craig Martin, Jim Lacy, Judy Cresanta, Helen V. England, Amie S. Carter, Robert Richard Dennik, Michael T. James, William J. Byrn, and Cobb County, Georgia, seek summary judgment against Defendants, William J. Clinton, The United States Department of Commerce; William M. Daley; Bureau of the Census and James F. Holmes in this action challenging defendants' plan for the 2000 census.

Plaintiffs claim that using statistical sampling to supplement the head count enumeration used to apportion representatives among the states violates the Census Act of 1976, 13 U.S.C. §§ 21, 195, and Article I, Section 2, Clause 3 of the Constitution. Plaintiffs seek a declaration that statistical sampling is unlawful and/or unconstitutional and an injunction preventing defendants from using statistical sampling in the 2000 census. The defendants seek dismissal of Plaintiffs' complaint on the grounds this case is not ripe for adjudication and that the plaintiffs lack personal standing to be parties in this case.

Now before the Court are the defendants' and intervenor-defendants' motions to dismiss the plaintiffs' complaint pursuant to Rule 12(b)(1) and (6) of the Federal Rules of Civil Procedure, and Plaintiffs' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For reasons stated below, the motions to dismiss will be denied and plaintiffs' motion for summary judgment will be granted.

### I. Background

Since 1790, the United States government has followed the constitutional command of Article I, Section 2, Clause 3 by carrying out a decennial census to allocate seats in the House of Representatives. In 1990, the Census Bureau instituted new outreach and promotion efforts to count the entire population, spending over $2.6 billion. The 1990 estimated net undercount rate was 1.6%. Certain minorities, notably African–Americans and Hispanics, had higher undercount rates than the population as a whole. Children and those living in rural areas also were differentially undercounted.

In response to the persistent undercount, in November 1990, the Secretary of Commerce established the "Task Force for Designing the Year 2000 Census and Census Related Activities for 2000–2009." Also, Congress passed the Decennial Census Improvement Act of 1991 directing the National Academy of Sciences to study the means by which the Government could achieve the most accurate population count possible, specifically considering the appropriateness of using sampling methods. The Academy found that statistical sampling should be used both for non-response follow-up and to increase accuracy. Relying on the results of the studies, the Census Bureau formulated its own plan for Census 2000.

The Secretary of Commerce's census plan will include sampling in at least three different programs of Census 2000. First, the Bureau will use sampling in the Postal Vacancy Check program, to verify housing units identified as vacant by the United States Postal Service. Second, the Census Bureau will use statistical sampling techniques to complete its traditional enumeration, an op-

eration referred to as "Non-response Follow-up" or "NRFU." Third, the Bureau will use sampling techniques to improve the accuracy of Census 2000 with a post-census survey, an operation the Bureau calls "Integrated Coverage Measurement" or "ICM." The Bureau's plan to use sampling in the Postal Vacancy Check is not in dispute in this lawsuit.

Over 60% of households mailed back their questionnaires in 1990, and the Bureau expects a similar mail response rate in 2000. In 1990, the Census Bureau sent enumerators to all non-responding households before relying on proxy data (information obtained from neighbors) or imputation data (computer-inferred data which are based on the assumption that the household has characteristics similar to other residences in the area). To account for those housing units that do not mail back forms in 2000, the Bureau's plan is to select at random the number of households that need to be counted in order to count 90 percent of the addresses in a census tract to whom questionnaires were mailed.

After the 90 percent goal has been reached, the Department will then add to its actual population count an estimate of the number of people in the households that were not selected for non-response follow-up. Thus, ten percent of the non-response follow-up units will not be physically counted. In making this estimate, the Department will not assume that the overall composition of these persons reflects the 90 percent of the people who were actually counted, but rather the plan is predicated on the assumption that these virtual persons will mirror the racial and ethnic composition of the persons who are identified in non-response follow-up.

The second phase of the enumeration is the Integrated Coverage Measurement survey, in which Census Enumerators will conduct interviews in a random population sample, separate from each state, to determine what proportion of the people living in the sample blocks were included in the initial enumeration. The Census Bureau's plan will classify each of the country's seven million blocks into groups known as sampling strata based on the characteristics of the block's residents according to the 1990 Census results, such as racial and ethnic composition, proportion of homeowners to renters, etc. The Bureau will select a controlled scientific sample of these blocks and enumerators will then conduct an independent second roster and ICM interview.

Each person and each enumeration is then assigned to a unique poststratum, a group of persons having similar probability of having been enumerated in the initial phase.[1] The Bureau will then estimate the number of persons in each poststratum who were correctly counted, missed, or over counted in the initial data collection phase. The Bureau will use that estimate to create an adjustment factor for each poststratum, and then multiply the number of people counted in each poststratum in the initial data collection phase by the appropriate adjustment factor to adjust the census count synthetically. Once the adjustment factors have been applied to each poststratum in a block, the statistically adjusted population figures for each block will be aggregated at the tract, county, state and national levels. This will be the reported population number used for Congressional apportionment and other purposes.

In its Report to Congress, the Bureau estimated that the total undercount of the national population in 2000 would be 1.9% if it relies on traditional methods of enumeration alone. The expected error rates for the Bureau's proposed plan vary according to the geographic level—with higher error rates at lower levels of geography (blocks, for example) and lower error rates at higher levels of geography (counties and states, for example). The Bureau expects that by using statistical sampling, it can achieve a lower error at the national, state, and Congressional district levels than it can without using sampling.

Employing statistical processes to include those who would be left out of the 2000 Census has sparked fierce debate within the political branches of the federal government since at least 1990, when it became apparent that the manner of enumerating used in the last two decennial censuses failed to ameliorate the differential undercount. In 1997, Congress attempted to amend 13 U.S.C. § 141(a) to provide: "[n]otwithstanding any other provision of law, no sampling or any

---

1. A poststratum could be all people within a state having the same sex, age, and racial/ethnic group.

other statistical procedure, including any statistical adjustment, may be used in any determination of population for purposes of the apportionment of Representatives in [C]ongress among the several States." H.R. 1469, tit. VIII(b)(1), at 65. The President vetoed this bill, in part due to the prohibition of the use of sampling in Census 2000.

Following this veto, Congress passed legislation requiring the Census Bureau to provide the Report to Congress. *See* Pub.L. 105–18, tit. VIII, 111 Stat. 158, 217 (1997). After receiving the Report to Congress, Congress and the President continued negotiations regarding sampling in the context of the legislation necessary to fund the Commerce Department for Fiscal Year 1998. The political branches eventually reached a compromise allowing the funding of the Commerce Department for Fiscal Year 1998. That compromise is embodied in Sections 209 and 210 of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1998, Pub.L. No. 105–119, 111 Stat. 2440, 2480–87 (1997). The Act contains separate provisions relating to lawsuits to challenge the use of sampling in Census 2000.

Section 209(b) of the Appropriations Act provides a cause of action to "[a]ny person aggrieved by the use of any statistical method in violation of the Constitution or any other provision of law (other than this Act) in connection with the 2000 or any later decennial census, to determine the population for purposes of the apportionment or redistricting members in Congress." Section 209(c)(2) provides that the Report to Congress "shall be deemed to constitute final agency action regarding the use of statistical methods in the 2000 decennial census, thus making the question of their use in such census sufficiently concrete and final to now be reviewable in a judicial proceeding."

II. Case is Ripe for Review

■ As a threshold matter, we note that the judicial review provision contained in the 1998 Appropriations Act eliminated all prudential ripeness concerns. *See Raines v. Byrd,* 521 U.S. 811, —— & n. 3, 117 S.Ct. 2312, 2318 & n. 3, 138 L.Ed.2d 849 (1997). To the extent that the ripeness doctrine has force under Article III, the Supreme Court's precedents clearly demonstrate that this case is ripe for review. *See Abbott Labs. v. Gard-*

*ner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

Given the finality of the Department's decision to utilize statistical sampling as a means to determining the population for the purposes of congressional apportionment in Census 2000, it is clear that ripeness concerns have no application in the instant case. The Department has acknowledged the finality of its decisions in its formal written reports submitted to Congress. Likewise, the Department's Operational Plan states that "sampling for non-response will be used to complete the census enumeration." As read in the Appropriations Act of 1998 § 209(c)(2), the Census 2000 Operational Plan "shall be deemed to constitute *final agency action* regarding the use of statistical methods in the 2000 decennial census," thus making the question of use ripe for adjudication. Appropriations Act of 1998 § 209(c)(2) (emphasis added).

Defendant's suggests that the case is not ripe because "Congress has not reached its ultimate legislative conclusion regarding a sampling census." Although it is certainly possibly that Congress may seek to prevent the Department from conducting its plan to utilize sampling, there is no legal significance to this observation. Congress may always moot out a controversy by passing new legislation, but that fact does not shield agency action from judicial review. There is always the possibility that settlement or some external event will render a case moot, but that hardly renders the litigation nonjusticiable before that event occurs. If the government's view were correct, then no agency action could ever be reviewed so long as Congress might intervene by passing new legislation that might overrule the final agency determination. *See New York v. United States,* 505 U.S. 144, 175, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (holding case ripe for review even though provision at issue would not take effect until three and a half years after the Court's decision during which time Congress could have repealed the provision); *see also Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) (holding that even when the event that would cause the damage had not yet occurred, the claims

in the case were still ripe for review); *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 581, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985) (holding where no further factual development is necessary to further illuminate the legal issues presented ripeness concerns are not implicated).

In the instant case, Plaintiffs challenge the defendants' use of statistical sampling in connection with the conduct of the census for congressional apportionment purposes. There is no material dispute as to the form that such sampling will take, and this action is justiciable on the merits presenting a question of statutory interpretation.

### III. Standing

 In considering a motion to dismiss for lack of standing, the Court must accept all material allegations contained in the complaint as true and must construe all such allegations in favor of standing. *See Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Pennell v. City of San Jose*, 485 U.S. 1, 7, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988). Moreover, for purposes of determining the standing of Plaintiffs to sue, the Court must assume the validity of Plaintiffs' claim that the Constitution and the Census Act require an actual enumeration and forbid the use of statistical sampling to determine the population for purposes of apportionment. *See Warth v. Seldin*, 422 U.S. at 501, 95 S.Ct. 2197.

 Plaintiffs clearly satisfy the constitutional requirements for standing imposed by Article III. There are several distinct, concrete injuries that the plaintiffs will imminently suffer if the Department's plan is implemented.

The plaintiffs do not need to prove with mathematical certainty the degree to which they will be injured by the Department's plan, as compared to a head count. Courts have never required such a showing under Article III especially in the context of a motion to dismiss where courts "presume that general allegations embrace those specific facts that are necessary to support [each] claim." *Bennett v. Spear*, 520 U.S. 154, ——, 117 S.Ct. 1154, 1164, 137 L.Ed.2d 281 (1997) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). General factual allegations of injury resulting from Defendants' conduct may suffice to establish Plaintiffs' Article III standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. at 561, 112 S.Ct. 2130; *see also Tucker v. United States Dept. of Commerce*, 958 F.2d 1411, 1415 (7th Cir. 1992) (holding requirements of Article III were met in a challenge to the validity of the census where Plaintiffs alleged "some probability of a tangible benefit from winning the suit").

 The plaintiffs have demonstrated that they will suffer injury as a result of the Department's plan, because they are able to calculate its effects by reference to the results of the Post–Enumeration Survey completed in 1992, which closely mirrors the methodology the Department will utilize as part of its plan for Census 2000. Courts have consistently found that plaintiffs challenging the census have satisfied the requirements of Article III standing where they have made allegations similar to those contained in the Complaint in this case. *See City of Detroit v. Franklin*, 4 F.3d 1367, 1374–75 (6th Cir.1993) (holding that plaintiffs had "standing to challenge the defendants' actions based upon their claim that the census undercount will result in a loss of federal funds"); *State of Texas v. Mosbacher*, 783 F.Supp. 308 (S.D.Tex.1992); *Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir.1980), *rev'd on other grounds*, 653 F.2d 732 (2d Cir.1981) ("individual plaintiffs in this case have alleged concrete harm in the form of dilution of their votes and decreased federal funds flowing to their city and state, thus establishing their standing"). The requirements of Article III are satisfied where a litigant has a "personal stake in the outcome of the controversy." *Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Here, Plaintiffs' claims of vote dilution and loss of federal funding meet the requirement of having a personal stake in the outcome of the controversy.

Individual citizens have standing to allege vote dilution resulting from allegedly unlawful legislative apportionment. *See Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (holding that plaintiffs, Tennessee voters, had a "plain, direct, and adequate" interest in maintaining the effectiveness of their votes and therefore had standing to maintain the action). Plaintiffs are individual taxpayers in Connecticut, Massachusetts,

Minnesota, Missouri, Pennsylvania, and Wisconsin, all which are substantially likely to lose a seat in the House of Representatives solely because of the implementation of the Department's plan.

Plaintiffs allege that the plan will dilute the voting strength of Plaintiffs at the intrastate level. Specifically, several plaintiffs reside in counties whose relative population will be diminished by operation of the Department's plan. This "elimination" of population constitutes vote dilution and a tangible injury resulting from the use of sampling. But for this statistical "adjustment," Plaintiffs' counties would have a larger population. When the population of neighboring counties is being increased by the addition of computer generated persons, this injury is compounded. Plaintiffs who reside in counties which will have their population increased by less than the average of the other counties in their state will necessarily suffer a loss in relative political representation.

Plaintiffs allege threatened injury in the form of loss of federal funds, and that the county plaintiffs will suffer a concrete injury as a consequence of the Department's plan. Specifically, Delaware County, Pennsylvania will have its proportional population decreased if statistical sampling is utilized in connection with Census 2000. Under the Post–Enumeration Survey from 1990, Delaware County had its absolute population reduced—the Department subtracted over 2,000 people who had been physically counted—by virtue of the statistical methodology which the Department proposes to utilize in Census 2000. Economic injury resulting from statistical sampling satisfies the requirements of Article III standing. *See City of Detroit v. Franklin,* 4 F.3d at 1374–75; *City of Willacoochee, Ga. v. Baldrige,* 556 F.Supp. 551, 554 (S.D.Ga.1983).

The Department's failure to conduct a proper enumeration may injure the plaintiffs where in the absence of population figures that comply with federal law, any elections in 2002 will have to be held on the basis of an incorrect number of representatives and malapportioned districts which reflect the 1990 census results. The Department will not be able to conduct a timely and complete, traditional enumeration if its plan is implemented and subsequently invalidated.

It appears to be virtually certain that Georgia will receive at least one additional congressional seat after the completion of a decennial census in the year 2000, regardless of whether the Department's plan or a traditional enumeration is used to conduct the census. Thus, Plaintiffs Matthew Glavin and William Byrne will have their votes diluted if they are forced to participate in an election in 2002 in which Georgia does not have the additional seat in Congress. Thus, Glavin, who resides in Forsyth County, Georgia, which has grown at a rate of 71% since 1990, as compared to an overall growth rate of 15.6% for the state of Georgia, will have his vote diluted in intrastate elections if the 1990 census numbers continue to be utilized beyond the 2000 elections. This same injury will be visited upon the county plaintiffs that have enjoyed a higher rate of population growth than their states since 1990. The population of Cobb County, Georgia, has grown by 23.1% since 1990, as compared to an overall population growth of 15.6% throughout Georgia. Thus, if there is no valid decennial census in place after the year 2000, Cobb County will receive fewer state and federal funds than it otherwise would if the Department had conducted a lawful census.

■ Plaintiffs are challenging the procedure by which Defendants intend to take the 2000 census, and it is well-established that a party may "seek[ ] to enforce a procedural requirement the disregard of which could impair a separate concrete interest[ ]" and that in such an action, the normal standard of immediacy does not apply. *See Lujan v. Defenders of Wildlife,* 504 U.S. at 572, 112 S.Ct. 2130.

■ Plaintiffs need not await the consummation of threatened injury to obtain preventive relief. *See Blum v. Yaretsky,* 457 U.S. 991, 1000, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). Plaintiffs injuries are imminent for several reasons. First, the Department has committed itself to use statistical sampling in Census 2000. The methodology, which parallels that used in 1990 Post–Enumeration Survey, will have the effect of reducing the relative population of those areas in which Plaintiffs reside. Moreover, the county plaintiffs also will be adversely affected by statistical sampling. Second, irrespective of

the actual effect of sampling, Plaintiffs will suffer injuries as a consequence of Defendants' failure to conduct a lawful census in a timely manner. This injury appears certain to occur and thus is premature only if a plaintiff must actually suffer a threatened injury prior to obtaining preventive relief. A plaintiff is not required to wait until a defendant engages in unlawful, unconstitutional conduct to have standing to seek judicial redress. *See Blum v. Yaretsky,* 457 U.S. at 991, 102 S.Ct. 2777; *Pennell v. City of San Jose,* 485 U.S. 1, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988); *Bennett v. Spear,* at –– –– ––, 117 S.Ct. at 1163–64 (holding general allegations of injury satisfy requirements of Article III, and a plaintiff need not allege each specific subsidiary fact that supports its general claim of injury).

■ Plaintiffs injuries are "fairly traceable" to Defendants' use of statistical sampling in the Census 2000. To satisfy the "fairly traceable" element of standing, a plaintiff need only show that the defendant's conduct complained of is a "but for" cause of the plaintiff's alleged injury. *See Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. at 59, 98 S.Ct. 2620. Here, there is a direct causal connection between Defendants' use of statistical sampling and Plaintiffs' loss of political representation. States are neither constitutionally nor federally compelled to use census data in determining their congressional districts. A state's choice to use such data for this purpose constitutes an "intervening" action that may break the chain of causation between challenged actions and alleged injury. The Supreme Court, however, has held that a defendant's action need not be the "very last step in the chain of causation" to establish that plaintiff's injuries are fairly traceable to defendants' conduct for the purpose of satisfying Article III. *See Bennett v. Spear,* at ––––, 117 S.Ct. at 1164.

Courts recognize that there is a direct correlation between decennial census population counts and federal and state funding allocations. *See Wisconsin v. City of New York,* 517 U.S. 1, 5–6, 116 S.Ct. 1091, 134 L.Ed.2d 167 (1996) (stating, "The Federal Government considers census data in dispensing funds through federal programs to the States..."); *City of Detroit v. Franklin,*

4 F.3d at 1374 (stating, "It is undisputed, however, that many federal programs do disburse funds based upon population figures as reported in the decennial census"); *Tucker v. United States Dept. of Commerce,* 958 F.2d at 1415 (stating, "there is no doubt that, as a matter of fact, the allocation of state and federal funds is heavily influenced by census figures..."). As a matter of law, allegations of decreased federal and state funding is fairly traceable to population counts reported in the decennial census. *See City of Detroit,* 4 F.3d at 1374. Plaintiffs affidavits establish that the implementation of statistical sampling in the 2000 census will directly result in a decrease of federal funding to the states and counties in which Plaintiffs reside.

■ Finally, a favorable decision will redress Plaintiffs' injuries. Redressability focuses on whether judicial intervention will provide an adequate remedy for a plaintiff's alleged injuries. *See Allen v. Wright,* 468 U.S. 737, 753 n. 19, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *Warth v. Seldin,* 422 U.S. 490, 502–06, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Courts have held that this element is satisfied where, as in the instant case, a plaintiff challenges the use of census methodology. *See Carey v. Klutznick,* 637 F.2d at 838 (citizens who challenge a census undercount on the basis that improper enumeration will result in loss of funds to their city have established both an injury fairly traceable to the Census Bureau and a substantial probability that court intervention will remedy the plaintiffs' injury). Plaintiffs have satisfied this element.

### IV. Statutory Interpretation

■ As recognized by both Plaintiffs and Defendants, aside from the standing and ripeness issues addressed in Defendants' motion to dismiss, the present case can be resolved simply on statutory interpretation.

The interplay of the two provisions of the Census Act, Sections 141(a) and 195 must be interpreted by the Court. Section 141(a) generally authorizes the Secretary to use sampling in conducting various aspects of the census, without an express prohibition. Section 141, entitled "Population and other census information," provides:

> The Secretary shall, in the year 1980 and every 10 years thereafter, take a decennial census of population as of the first day of April of such year, which date shall be

known as the "decennial census date" in such form and content as he may determine, including the use of sampling procedures and special surveys. In connection with any such census, the Secretary is authorized to obtain such other census information as is necessary.

The Census Act of 1976, 13 U.S.C. § 141(a).

In plain text, Section 195 entitled "Use of Sampling" provides:

Except for the determination of population for purposes of apportionment of Representatives in Congress among the several States, the Secretary shall, if he considers it feasible, authorize the use of the statistical method known as "sampling" in carrying out the provisions of this title.

The Census Act of 1976, 13 U.S.C. § 195.

The Supreme Court held in *Ashwander v. TVA,* "if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter." *Ashwander v. TVA,* 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). Thus, this case can be resolved on statutory basis alone without reaching the Constitutional question.[2] Congress has spoken precisely to the question of statistical sampling by the Department and, in plain language, prohibited the use of this methodology to derive the population used for purposes of congressional apportionment. Thus, the Department's decision to use statistical sampling to create the census population for congressional apportionment purposes, is not authorized by the governing statute.

 The Supreme Court has been clear that "[i]t is the 'cardinal principle of statuto-

ry construction' ... 'to give effect, if possible, to every clause and word of a statute ... rather than to emasculate an entire section.' " *Bennett v. Spear,* at ——, 117 S.Ct. at 1166 (quoting *United States v. Menasche,* 348 U.S. 528, 538, 75 S.Ct. 513, 99 L.Ed. 615 (1955)(stating "[t]he cardinal principle of statutory construction is to save and not to destroy")); *see United States v. Nordic Village, Inc.,* 503 U.S. 30, 36, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992); *Gade v. National Solid Wastes Management Ass'n,* 505 U.S. 88, 100, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992). As between two statutory provision concerning the same topic, the more specific section governs the general. "The law is settled that 'however inclusive may be the general language of a statute, it will not be held to apply to a matter specifically dealt with in another part of the same enactment.' " *Fourco Glass Co. v. Transmirra Products Corp.,* 353 U.S. 222, 228–29, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957); *see also Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 384, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (stating "it is a commonplace of statutory construction that the specific governs the general..."). Thus, the Court must determine the interplay between Section 141 and Section 195 of the Census Act in deciding whether sampling may be used in the Census 2000 to apportion representatives among the states.

Section 141 of the Census Act generally authorizes the Secretary to use sampling in conducting various aspects of the census, without an express prohibition. 13 U.S.C. § 141. A reading of the plain language of Section 141 itself further establishes that Congress' intent was to authorize sampling

**2.** The language of the Constitution that mandates a head count of the population is contained in both Constitutional provisions controlling the means of deriving the population figures for Congressional apportionment.

Section 2 of the Fourteenth Amendment states in relevant part that

"Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed."

Article I, Section 2, Clause 3 of the Constitution has the same provision with respect to representatives, as amended by the Fourteenth Amendment mentioned above, and calls the computation of the "respective numbers" an "actual Enumeration" to be made "in such Manner as they [Congress] shall by Law direct."

The argument states that the plain language of the Constitution requires an actual head count because the meaning of the word "count" is "to number" and that an "actual Enumeration" may not include statistical sampling.

However attractive deciding the Constitutional question may be, and however correct the argument may appear, we are constrained by *Ashwander v. TVA,* 297 U.S. 288, 341, 346–47, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring), and do not anticipate a question of Constitutional law in advance of the necessity of deciding it. Neither do we pass upon a Constitutional question, even if properly presented by the record; if there is also present some other ground upon which the case may be disposed of. Thus, our decision is based on construing the relevant statutes, and we do not reach the Constitutional question.

for numerous purposes of the census other than congressional apportionment. "As used in this section, 'census of the population' means a census of a population, housing, and matters relating to population and housing." 13 U.S.C. § 141(g).

Under 13 U.S.C. § 195, Congress' prohibition against the use of sampling is clear on its face. The statute specifically and prohibitorily states that: *"[e]xcept for the determination of population for purposes of apportionment of Representatives in Congress among the several States,* the Secretary shall, if he considers it feasible, authorize the use of the statistical method known as 'sampling' in carrying out the provisions of this title." (emphasis added). The language in § 195 makes clear that the "statistical method known as 'sampling'" may not be used for determining the apportionment of Representatives of Congress. 13 U.S.C. § 195. The "except for" language thus plainly imposes a restriction forbidding the sampling method in collecting numbers for apportionment. The restriction is inseparable from the grant of authority to use sampling in other ways.

In *Richardson v. Ramirez,* 418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974), the Supreme Court confirmed that the "except for" "language of § 2 [of the Fourteenth Amendment,] expressly exempts from the sanction of that section disenfranchisement grounded on prior conviction of a felony." *Id.* at 43, 94 S.Ct. 2655. Similarly, in *Crosby v. United States,* 506 U.S. 255, 113 S.Ct. 748, 122 L.Ed.2d 25 (1993), the Court interpreted a statute requiring the presence of criminal defendants "except as otherwise provided" as constituting an express limitation of the circumstances where a criminal defendant could permissibly be absent. In light of the statute's "express use of the limiting phrase . . . the language and structure of the rule could not be more clear." *Id.* at 259, 113 S.Ct. 748. As such, the "except for" language of Section 195 of the Census Act could not be more clear, expressly exempting from the general authorization of that section any use of sampling for purposes of congressional apportionment.

Defendants' argument that its authority to sample is precisely the same with the "except for" language as it would be if the statute did not contain that language renders the "except for" language devoid of meaning. The Supreme Court has been clear that if possible, a statute must be construed "in such fashion that every word has some operative effect." *See United States v. Nordic Village, Inc.,* 503 U.S. 30, 36, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992)(rejecting statutory interpretation that "violated the settled rule that a statute's every word has operative effect"); *Bennett v. Spear,* 520 U.S. 154, 117 S.Ct. 1154, 1166, 137 L.Ed.2d 281 (1997)(holding principle of statutory construction is to give effect to every clause and word of a statute); *Gade v. National Solid Wastes Management Ass'n,* 505 U.S. 88, 100, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992); *United States v. Menasche,* 348 U.S. 528, 538, 75 S.Ct. 513, 99 L.Ed. 615 (1955). Reading the general authorization for sampling in Section 141 as some how negating the prohibition of sampling for congressional apportionment in Section 195 would render the language of Section 195 meaningless. Rather, the statute must be read to give meaning to both provisions.

To the extent that Sections 141 and 195 could not be reconciled, established principles of statutory analysis require that the "except for" language in Section 195 prevail. Statutory construction governs requiring the more specific section concerning the same topic governs the general. *See Fourco Glass Co. v. Transmirra Products Corp.,* 353 U.S. 222, 228–29, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957); *see also Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 384, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992); *HCSC–Laundry v. United States,* 450 U.S. 1, 6, 101 S.Ct. 836, 67 L.Ed.2d 1 (1981) (per curiam) ("it is a basic principle of statutory construction that a specific statute . . . controls over a general provision . . . particularly when the two are interrelated and closely positioned. . ."); *Aeron Marine Shipping Co. v. United States,* 695 F.2d 567, 576 (D.C.Cir.1982). Thus, where Section 195 is a specific statutory prohibition of sampling for apportionment of Congress, it prevails over the more general provisions of Section 141's grant of authority to the Secretary.

In sum, the only plausible interpretation of the plain language and structure of the Act is that Section 195 prohibits sampling for ap-

portionment and Section 141 allows it for all other purposes. When viewed in the context of the statute as a whole, Section 141 in no way undermines the definite prohibition of sampling for purposes of apportionment contained in Section 195. As Congress prohibited sampling for purposes of apportionment, the Secretary has no authority to do anything but an actual head count of the population for this purpose.

This conclusive reading of the statute's text on its face ends the Court's task whereas "the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" *See Robinson v. Shell Oil Co.,* 519 U.S. 337, ——, 117 S.Ct. 843, 846, 136 L.Ed.2d 808 (1997) (quoting *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 240, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)); *Connecticut National Bank v. Germain,* 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) ( stating "[w]hen the words of a statute are unambiguous, [ ] this first canon is also the last: 'judicial inquiry is complete.'") (quoting *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981)); *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 475, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992) ("when a statute speaks with clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstances, is finished.") (citing *Demarest v. Manspeaker,* 498 U.S. 184, 190, 111 S.Ct. 599, 112 L.Ed.2d 608 (1991)). Because the Court finds the reading of section 141(a) and section 195 are clear on its face, the Court finds no need to reach the constitutional questions presented. Therefore, this Court finds that the defendants should be permanently enjoined from using any form of statistical sampling, including their program for nonresponse follow-up and Integrated Coverage Measurement, to determine the population for purposes of congressional apportionment.

An appropriate order shall issue.

Judges WIDENER and JACKSON concur.