Justice Thomas,
with whom The Chief Justice, Justice Scalia, and Justice Kennedy join,
dissenting.
Under our Constitution, the States are not subject to suit by private parties for monetary relief absent their consent or a valid congressional abrogation, and it is “settled doctrine” that nothing in Article I of the Constitution establishes those preconditions. Alden v. Maine, 527 U. S. 706, 748 (1999). Yet the Court today casts aside these long-established principles to hold that the States are subject to suit by a rather unlikely class of individuals — bankruptcy trustees seeking recovery of preferential transfers for a bankrupt debtor’s estate. This conclusion cannot be justified by the text, structure, or history of our Constitution. In addition, today’s ruling is not only impossible to square with this Court’s settled state sovereign immunity jurispru *380 dence; it is also impossible to reach without overruling this Court’s judgment in Hoffman v. Connecticut Dept. of Income Maintenance, 492 U. S. 96 (1989).
The majority maintains that the States’ consent to suit can be ascertained from the history of the Bankruptcy Clause. But history confirms that the adoption of the Constitution merely established federal power to legislate in the area of bankruptcy law, and did not manifest an additional intention to waive the States’ sovereign immunity against suit. Accordingly, I respectfully dissent.
I
The majority does not appear to question the established framework for examining the question of state sovereign immunity under our Constitution. The Framers understood, and this Court reiterated over a century ago in Hans v. Louisiana, 134 U. S. 1 (1890):
“‘It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent. This is the general sense and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every State in the Union. Unless, therefore, there is a surrender of this immunity in the plan of the convention, it will remain with the States_’” Id., at 13 (quoting The Federalist No. 81, pp. 548-549 (J. Cooke ed. 1961) (hereinafter The Federalist No. 81); emphasis added and deleted).
See also Ex parte New York, 256 U. S. 490,497 (1921) (“That a State may not be sued without its consent is a fundamental rule of jurisprudence having so important a bearing upon the construction of the Constitution of the United States that it has become established by repeated decisions of this court that the entire judicial power granted by the Constitution does not embrace authority to entertain a suit brought by *381 private parties against a State without consent given”); Seminole Tribe of Fla. v. Florida, 517 U. S. 44, 54 (1996).
These principles were further reinforced early in our Nation’s history, when the people swiftly rejected this Court’s decision in Chisholm v. Georgia, 2 Dall. 419 (1793), by ratifying the Eleventh Amendment less than two years later. See Hans, supra, at 11; Reid v. Covert, 354 U. S. 1,14, n. 27 (1957) (plurality opinion). Thus, “[f]or over a century [since Hans] we have reaffirmed that federal jurisdiction over suits against unconsenting States ‘was not contemplated by the Constitution when establishing the judicial power of the United States.’” Seminole Tribe, supra, at 54 (quoting Hans, supra, at 15); see also Seminole Tribe, supra, at 54-55, n. 7 (collecting cases).
The majority finds a surrender of the States’ immunity from suit in Article I of the Constitution, which authorizes Congress “[t]o establish . . . uniform Laws on the subject of Bankruptcies throughout the United States.” §8, cl. 4. But nothing in the text of the Bankruptcy Clause suggests an abrogation or limitation of the States’ sovereign immunity. Indeed, as this Court has noted on numerous occasions, “[t]he Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction.” Seminole Tribe, supra, at 72-73. “[I]t is settled doctrine that neither substantive federal law nor attempted congressional abrogation under Article I bars a State from raising a constitutional defense of sovereign immunity in federal court.” Alden, supra, at 748. See also Kimel v. Florida Bd. of Regents, 528 U. S. 62, 80 (2000); Board of Trustees of Univ. of Ala. v. Garrett, 531 U. S. 356, 364 (2001). And we have specifically applied this “settled doctrine” to bar abrogation of state sovereign immunity under various clauses within § 8 of Article I. See, e. g., Seminole Tribe, supra (the Interstate and Indian Commerce Clauses); Florida Prepaid Postsecondary Ed. Expense Bd. *382 v. College Savings Bank, 527 U. S. 627 (1999) (the Patents Clause).
It is difficult to discern an intention to abrogate state sovereign immunity through the Bankruptcy Clause when no such intention has been found in any of the other clauses in Article I. Indeed, our cases are replete with acknowledgments that there is nothing special about the Bankruptcy Clause in this regard. See Seminole Tribe, 517 U. S., at 72-73, n. 16; see also id., at 93-94 (Stevens, J., dissenting) (“In confronting the question whether a federal grant of jurisdiction is within the scope of Article III, as limited by the Eleventh Amendment, I see no reason to distinguish among statutes enacted pursuant to the power granted to Congress to regulate commerce among the several States, and with the Indian tribes, the power to establish uniform laws on the subject of bankruptcy, [or] the power to promote the progress of science and the arts by granting exclusive rights to authors and inventors” (citations omitted)); id., at 77-78, and n. 1 (Stevens, J., dissenting); Hoffman, 492 U. S., at 105 (Scalia, J., concurring in judgment). Today’s decision thus cannot be reconciled with our established sovereign immunity jurisprudence, which the majority does not purport to overturn.
The majority’s departure from this Court’s precedents is not limited to this general framework, however; the majority also overrules sub silentio this Court’s holding in Hoffman, supra. The petitioner in Hoffman, id., at 99 — like respondent Katz here — sought to pursue a preference avoidance action against a state agency pursuant to 11 U. S. C. § 547(b). The plurality opinion, joined by four Members of this Court, held that Eleventh Amendment immunity barred suit because Congress had failed to enact legislation sufficient to abrogate that immunity, and expressed no view on whether Congress possessed the constitutional power to do so. Hoffman, supra, at 104. Justice Scalia concurred in the judgment, arguing that there was no need to examine the statute *383 because the Bankruptcy Clause does not empower Congress to enact legislation abrogating state sovereign immunity. See 492 U. S., at 105; see also ibid. (O’Connor, J., concurring) (“I agree with Justice Scalia that Congress may not abrogate the States’ Eleventh Amendment immunity by enacting a statute under the Bankruptcy Clause”). Thus, a majority of the Court in Hoffman agreed: (1) that a preference action in bankruptcy against a state agency is barred by sovereign immunity; and (2) that, at a minimum (and absent the State’s consent), overcoming that immunity would require a clearer statutory abrogation than Congress had provided.[1]
After today’s decision, however, Hoffman can no longer stand. For today’s decision makes clear that no action of Congress is needed because the Bankruptcy Clause itself manifests the consent of the States to be sued. Ante, at 378.
II
The majority supports its break from precedent by relying on historical evidence that purportedly reveals the Framers’ intent to eliminate state sovereign immunity in bankruptcy proceedings. Ante, at 362-363, 373. The Framers undoubtedly wanted to give Congress the authority to enact a national law of bankruptcy, as the text of the Bankruptcy Clause confirms. But the majority goes further, contending that the Framers found it intolerable that bankruptcy laws could vary from State to State, and demanded the enactment of a single, uniform national body of bankruptcy law. Ante, at 365-368. The majority then concludes that, to achieve a uniform national bankruptcy law, the Framers must have intended to waive the States’ sovereign immunity against suit. Ante, at 362. Both claims are unwarranted.
*384 A
In contending that the States waived their immunity from suit by adopting the Bankruptcy Clause, the majority conflates two distinct attributes of sovereignty: the authority of a sovereign to enact legislation regulating its own citizens, and sovereign immunity against suit by private citizens.[2] Nothing in the history of the Bankruptcy Clause suggests that, by including that clause in Article I, the founding generation intended to waive the latter aspect of sovereignty. These two attributes of sovereignty often do not run together — and for purposes of enacting a uniform law of bankruptcy, they need not run together.
For example, Article I also empowers Congress to regulate interstate commerce and to protect copyrights and patents. These provisions, no less than the Bankruptcy Clause, were motivated by the Framers’ desire for nationally uniform legislation. See James Madison, Preface to Debates in the Convention of 1787, reprinted in 3 M. Farrand, Records of the Federal Convention of 1787, pp. 539, 547-548 (1911) (hereinafter Farrand’s Debates) (noting lack of national regulation of commerce and uniform bankruptcy law as defects under the Articles of Confederation); M. Farrand, The Framing of the Constitution of the United States 48 (1913) (noting that the Articles of Confederation failed to provide for uniform national regulation of naturalization, bankruptcy, copyrights, and patents). Thus, we have recognized that “[t]he need for uniformity in the construction of patent law is undoubtedly important.” Florida Prepaid, 527 U. S., at 645. Nonetheless, we have refused, in addressing patent law, to give the need for uniformity the weight the majority today *385 assigns it in the context of bankruptcy, instead recognizing that this need “is a factor which belongs to the Article I patent-power calculus, rather than to any determination of whether a state plea of sovereign immunity deprives a pat-entee of property without due process of law.” Ibid.
Nor is the abrogation of state sovereign immunity from suit necessary to the enactment of nationally uniform bankruptcy laws. The sovereign immunity of the States against suit does not undermine the objective of a uniform national law of bankruptcy, any more than does any differential treatment between different categories of creditors. Cf. Railway Labor Executives’ Assn. v. Gibbons, 455 U. S. 457, 469 (1982) (“The uniformity requirement is not a straightjacket that forbids Congress to distinguish among classes of debtors, nor does it prohibit Congress from recognizing that state laws do not treat commercial transactions in a uniform manner”).
B
The majority also greatly exaggerates the depth of the Framers’ fervor to enact a national bankruptcy regime. The idea of authorizing Congress to enact a nationally uniform bankruptcy law did not arise until late in the Constitutional Convention, which began in earnest on May 25, 1787. 1 Farrand’s Debates xi. The Convention charged the Committee of Detail with putting forth a comprehensive draft Constitution, which it did on August 6. Ibid.; 2 id., at 177. Yet the Convention did hot consider the language that eventually became the Bankruptcy Clause until September 1, id., at 483-485, and it adopted the pro vision, with little debate two days later, id., at 489. Under the majority’s analysis, which emphasizes the Framers’ zeal to enact a national law of bankruptcy, this timing is difficult to explain.
The majority’s premise fares even worse in explaining the postratification period. The majority correctly notes that the practice of the early Congresses can provide valuable *386 insight into the Framers’ understanding of the Constitution. Ante, at 373, 374. But early practice undermines, rather than supports, the majority’s theory. “For over a century after the Constitution,... the Bankruptcy Clause [authority] remained largely unexercised by Congress.. . . Thus, states were free to act in bankruptcy matters for all but 16 of the first 109 years after the Constitution was ratified.” Tabb, The History of the Bankruptcy Laws in the United States, 3 Am. Bankr. Inst. L. Rev. 5, 13-14 (1995). And when Congress did act, it did so only in response to a major financial disaster, and it repealed the legislation in each instance shortly thereafter. Id., at 14-21.[3] It was not until 1898, well over a century after the adoption of the Bankruptcy Clause, that Congress adopted the first permanent national bankruptcy law. 30 Stat. 544.
The historical record thus refutes, rather than supports, the majority’s premise that the Framers placed paramount importance on the enactment of a nationally uniform bank *387 ruptcy law. In reality, for most of the first century of our Nation’s history, the country survived without such a law, relying instead on the laws of the several States.
Moreover, the majority identifies no historical evidence suggesting that the Framers or the early Legislatures, even if they were anxious to establish a national bankruptcy law, contemplated that the States would subject themselves to private suit as creditors under that law. In fact, the historical record establishes that the Framers held the opposite view. To the Framers, it was a particularly grave offense to a State’s sovereignty to be hauled into court by a private citizen and forced to make payments on debts. Alexander Hamilton, the author of Federalist No. 81, followed his general discussion of state sovereign immunity by emphasizing that the Constitution would be especially solicitous of state sovereignty within the specific context of payment of state debts:
“‘[Tjhere is no color to pretend that the state governments would, by the adoption of that plan, be divested of the privilege of paying their own debts in their own way, free from every constraint but that which flows from the obligations of good faith. The contracts between a nation and individuals are only binding on the conscience of the sovereign, and have no pretension to a compulsive force. They confer no right of action independent of the sovereign will. To what purpose would it be to authorize suits against States for the debts they owe? How could recoveries be enforced? It is evident that it could not be done without waging war against the contracting State; and to ascribe to the federal courts by mere implication, and in destruction of a pre-existing right of the state governments, a power which would involve such a consequence, would be altogether forced and unwarrantable.’” Hans, 134 U. S., at 13 (quoting The Federalist No. 81, at 549).
*388 C
The majority attempts to bolster its historical argument by making three additional observations about the bankruptcy power: (1) Congress’ early provision of habeas corpus relief in bankruptcy to forbid the imprisonment of a debtor by one State, in violation of a discharge order issued by the courts of another State, ante, at 365-366, 374-375; (2) the inability of debtors, first in the American Colonies and then under the Articles of Confederation, to enforce in one state court a discharge order issued by another state court, ante, at 366-368; and (3) the historical understanding that bankruptcy jurisdiction is principally in rem, ante, at 369-373. The implication is that, if these specific observations about bankruptcy are correct, then States must necessarily be subject to suit in transfer recovery proceedings, if not also in other bankruptcy settings. Ante, at 370; ante, at 377-378. But none of these observations comes close to demonstrating that, under the Bankruptcy Clause, the States may be sued by private parties for monetary relief.[4]
1
The availability of habeas relief in bankruptcy between 1800 and 1803 does not support respondent’s effort to obtain monetary relief in bankruptcy against state agencies today.[5] The habeas writ was well established by the time *389 of the framing, and consistent with then-prevailing notions of sovereignty. In Ex parte Young, 209 U. S. 123 (1908), this Court held that a petition for the writ is a suit against a state official, not a suit against a State, and thus does not offend the Eleventh Amendment:
“The right to so discharge has not been doubted by this court, and it has never been supposed there was any suit against the State by reason of serving the writ upon one of the officers of the State in whose custody the person was found. In some of the cases the writ has been refused as matter of discretion; but in others it has been granted, while the power has been fully recognized in all.” Id., at 168 (collecting cases).
This Court has reaffirmed Young repeatedly — including in Seminole Tribe, 517 U. S., at 71, n. 14. Although the majority observes that Young was not issued “until over a century after the framing and the enactment of the first bankruptcy statute,” ante, at 378, n. 14, this observation does nothing to reconcile the majority’s analysis with Young, as the majority does not purport to question the historical underpinnings of Young’s holding. The availability of federal habeas relief to debtors in state prisons thus has no bearing whatsoever on whether the Bankruptcy Clause authorizes suits against the States for money damages.[6]
*390 2
The majority’s second observation — that the Framers were concerned that, under the Articles of Confederation, debtors were unable to obtain discharge orders issued by the court of one State that would be binding in the court of another State, ante, at 366-368 — implicates nothing more than the application of full faith and credit, as is apparent from the majority opinion itself. Accordingly, it has nothing to do with state sovereign immunity from suit.
To support its observation, the majority describes at length two Pennsylvania court rulings issued under the Articles of Confederation. See James v. Allen, 1 Dall. 188 (C. P. Phila. Cty. 1786); Millar v. Hall, 1 Dall. 229 (Pa. 1788). But as the majority’s explanation makes clear, the problem demonstrated by these cases is the need for recognition of sister-state judgments by state courts, not disregard for state sovereign immunity against suit in federal courts. Both James and Millar involved litigation between a private debtor and a private creditor. In both cases, the creditor filed suit in a Pennsylvania court to enforce a debt. And in both cases, the debtor sought but failed to obtain, recognition of a judgment of discharge that had previously been entered by a court of another State. Ante, at 368.
Accordingly, it is unsurprising that, when the issue of bankruptcy arose at the Constitutional Convention, it was also within the context of full faith and credit. See ante, at 368-369.[7] As the majority correctly points out, the Framers *391 “plainly intended to give Congress the power to redress the rampant injustice resulting from States’ refusal to respect one another’s discharge orders.” Ante, at 377. But redress of that “rampant injustice” turned entirely on binding state courts to respect the discharge orders of their sister States under the Full Faith and Credit Clause, not on the authorization of private suits against the States.
3
Finally, the majority observes that the bankruptcy power is principally exercised through in rem jurisdiction. Ante, at 369-373. The fact that certain aspects of the bankruptcy power may be characterized as in rem, however, does not determine whether or not the States enjoy sovereign immunity against such in rem suits. And it certainly does not answer the question presented in. this case: whether the Bankruptcy Clause subjects the States to transfer recovery proceedings — proceedings the majority describes as “ancillary to and in furtherance of the court’s in rem jurisdiction,” though not necessarily themselves in rem, ante, at 372.
Two years ago, this Court held that a State is bound by a bankruptcy court’s discharge order, notwithstanding the State’s invocation of sovereign immunity, because such actions arise out of in rem jurisdiction. See Tennessee Student Assistance Corporation v. Hood, 541 U. S. 440, 448 (2004). In doing so, however, the Court explicitly distinguished recovery of preferential transfers, noting that the debt discharge proceedings there were “unlike an adversary proceeding by the bankruptcy trustee seeking to recover *392 property in the hands of the State on the grounds that the transfer was a voidable preference.” Id., at 454.
The fact that transfer recovery proceedings fall outside any possible in rem exception to sovereign immunity is confirmed by United States v. Nordic Village, Inc., 503 U. S. 30 (1992), which involved similar facts. There, the Bankruptcy Trustee filed a transfer avoidance action against the United States, in order to recover a recent payment the debtor had made to the Internal Revenue Service on a tax debt. See id., at 31. After determining that the United States had not waived its sovereign immunity, the Court rejected the trustee’s alternative argument based on in rem jurisdiction. As the Court explained, “[respondent sought to recover a sum of money, not ‘particular dollars,’ so there was no res to which the court’s in rem jurisdiction could have attached.” Id., at 38 (quoting Begier v. IRS, 496 U. S. 53, 62 (1990); citations omitted and emphasis deleted).[8]
The majority attempts to evade Nordic Village by claiming that “the trustee in this case, unlike the one in Nordic Village, seeks, in the alternative, both return of the ‘value’ of the preference, . . . and return of the actual ‘property transferred.’ ” Ante, at 372, n. 10 (quoting 11 U. S. C. § 550(a)). But where, as here, the property in question is *393 money, there is no practical distinction between these two options, and surely we did not reach the result in Nordic Village because of an accident of pleading. Moreover, it is hardly clear that the trustee in Nordic Village failed to ask for a “return” of the “ ‘property transferred,’ ” ante, at 372, n. 10, and the majority does not cite anything to support its assertion. See also Nordic Village, supra, at 31 (“[T]he trustee ... commenced an adversary proceeding... seeking to recover, among other transfers, the $20,000 paid ... to the IRS”); In re Nordic Village, Inc., 915 F. 2d 1049, 1051 (CA6 1990) (“The trustee subsequently initiated a proceeding to recover several unauthorized post-petition transfers, including the transfer to the IRS”).
In light of the weakness of its historical evidence that the States consented to be sued in bankruptcy proceedings, the majority’s effort to recast respondent’s action as in rem is understandable, but unconvincing.
* * *
It would be one thing if the majority simply wanted to overrule Seminole Tribe altogether. That would be wrong, but at least the terms of our disagreement would be transparent. The majority’s action today, by contrast, is difficult to comprehend. Nothing in the text, structure, or history of the Constitution indicates that the Bankruptcy Clause, in contrast to all of the other provisions of Article I, manifests the States’ consent to be sued by private citizens.
I respectfully dissent.

 The parties in Hoffman likewise agreed that the suit was barred by Eleventh Amendment immunity absent some further action by Congress. 492 U. S., at 101.

 Immunity against suit is just “one of the attributes of sovereignty,... enjoyed by the government of every state in the union.” The Federalist No. 81, at 549. The sovereign power to legislate is a distinct attribute of sovereignty; it is discussed, for example, in a completely separate portion of the Federalist than immunity from suit. See, e. g., id., No. 32.

 For over a dozen years after the ratification of the Constitution, Congress failed to adopt a single bankruptcy law. See, e. g., 9 Annals of Congress 2671 (1799) (noting that Congress had “not.. . passed [bankruptcy legislation] for these ten years past, and the States [have] legislated upon it in their own way” (statement of Rep. Baldwin)); 3 Farrand’s Debates 380 (same). It was not until April 4,1800, that the Sixth Congress finally adopted our Nation’s first bankruptcy law, ch. 19,2 Stat. 19, and even that law left an ample role for state law, §61, id., at 36. (By contrast, the very first Congress enacted, inter alia, patent and copyright legislation. 1 Stat. 109,124.)
Moreover, that first Act was short lived; Congress repealed it just three years later. 2 Stat. 248. And over a decade later, this Court confirmed what Congress’ inattention had already communicated — that the Bankruptcy Clause does not vest exclusive power in Congress, but instead leaves an ample role for the States. See Sturges v. Crowninshield, 4 Wheat. 122 (1819). It was not until 1841 that Congress would enact another bankruptcy law, ch. 9, 5 Stat. 440, only to repeal it less than two years later, ch. 82, id., at 614. The economic upheaval of the Civil War caused Congress to pass another bankruptcy law in 1867, ch. 176,14 Stat. 517, but that too was repealed after just over a decade, ch. 160,20 Stat. 99.

 To be sure, the majority opinion adds, in a footnote, that “[w]e do not mean to suggest that every law labeled a ‘bankruptcy’ law could, consistent with the Bankruptcy Clause, properly impinge upon state sovereign immunity.” Ante, at 378, n. 15. But the majority offers no explanation of this statement; certainly it offers no principled basis on which to draw distinctions in future cases.

This is particularly so given the absence of any known application of that law (let alone any test of its validity) during that time. The provision was enacted into law on April 4,1800, ch. 19,2 Stat. 19, and repealed on December 19, 1803, ch. 6, id., at 248. The sole reference cited by the majority is In re Comstock, 6 F. Cas. 237 (No. 3,073) (Vt. 1842), see ante, at 374, but that ruling, issued nearly 40 years after the 1800 Act’s repeal, merely noted in dicta the prior existence of the habeas provision.

 The majority also contends that the provision for habeas relief in the 1800 bankruptcy law is “remarkable not least because it would be another 67 years, after Congress passed the Fourteenth Amendment, before the writ would be made generally available to state prisoners.” Ante, at 374. The implication is that the Bankruptcy Clause shares a similar pedigree with the Fourteenth Amendment, which (unlike Article I of the Constitution) authorizes Congress to abrogate state sovereign immunity against suit. See, e. g., Fitzpatrick v. Bitzer, 427 U. S. 445 (1976). But as the majority recognizes, ante, at 374-375, n. 11, Congress did enact other habeas provisions prior to the Fourteenth Amendment. See 4 Stat. 632; 5 Stat. 539; see generally W. Duker, A Constitutional History of Habeas Corpus 187-189 (1980) (discussing the 1833 and 1842 Acts). The Fourteenth Amendment bears no relevance to this discussion in any event, *390 because as I have explained above, habeas relief simply does not offend the Framers’ view of state sovereign immunity. See also Young, 209 U. S., at 150 (“[A] decision of this case does not require an examination or decision of the question whether [the] adoption [of the Fourteenth Amendment] in any way altered or limited the effect of the [Eleventh] Amendment”).

 The same point was made in Railway Labor Executives’ Assn. v. Gibbons, 455 U. S. 457 (1982): “Prior to the drafting of the Constitution, at least four States followed the practice of passing private Acts to relieve individual debtors. Given the sovereign status of the States, questions *391 were raised as to whether one State had to recognize the relief given to a debtor by another State [citing James and Millar). Uniformity among state debtor insolvency laws was an impossibility and the practice of passing private bankruptcy laws was subject to abuse if the legislators were less than honest. Thus, it is not surprising that the Bankruptcy Clause was introduced during discussion of the Full Faith and Credit Clause.” Id., at 472 (citations omitted).

 Begier involved funds held by the debtor in statutory trust for the United States — so its analysis of those “particular dollars” does not help the respondent in this case. 496 U. S., at 62 (emphasis deleted). Nor does United States v. Whiting Pools, Inc., 462 U. S. 198 (1983), support the majority’s effort. In Whiting Pools, the United States waived its immunity by filing suit. See id., at 200-201; see also Nordic Village, 503 U. S., at 39 (“The Court’s opinion in Whiting Pools contains no discussion of § 106(c) [the waiver provision]”). Furthermore, in Whiting Pools the Government possessed merely a secured interest in the property on the basis of a tax lien, see 462 U. S., at 202. By contrast, here, as in Nordic Village, it is uncontested that the State owns the funds, barring any subsequent transfer by operation of bankruptcy law. See 503 U. S., at 39 (“A suit for payment of funds from the Treasury is quite different from a suit for the return of tangible property in which the debtor retained ownership”).